NAME **Troy A. Bartholmew**

PRISON NUMBER **H-18717**

**Avenal State Prison**
**P.O. Box 9, 1 Kings Way**
CURRENT ADDRESS OR PLACE OF CONFINEMENT

**Avenal, California 93204**

CITY, STATE, ZIP CODE





FILED
JUL 14 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY          DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

**TROY A. BARTHOLOMEW** ,
(FULL NAME OF PETITIONER)

**PETITIONER**

v.

**KATHY MENDOZA-POWERS et al.**
(NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER [E.G., DIRECTOR OF THE
CALIFORNIA DEPARTMENT OF CORRECTIONS])

**RESPONDENT**

and

The Attorney General of the State of
California, Additional Respondent.

Civil No **'08 CV 1270 IEG NLS**

(TO BE FILLED IN BY CLERK OF U.S. DISTRICT COURT)

**PETITION FOR WRIT OF HABEAS CORPUS**

UNDER 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY

1. Name and location of the court that entered the judgment of conviction under attack:

   **N/A: This petition concerns Parole.**

2. Date of judgment of conviction: **November 15, 1991**

3. Trial court case number of the judgment of conviction being challenged: **CR-124142**

4. Length of sentence: **Life with the possibility of parole plus 12 years.**

CIV 68 (Rev. Jan. 2006)

cv

5. Sentence start date and projected release date: December 26, 1991 and approximately July 2005.

6. Offense(s) for which you were convicted or pleaded guilty (all counts): §§ 187(a)/664/189 w/enhancements p.c.12022.5(a) and p.c.12022.7.

7. What was your plea? (CHECK ONE)

    (a) Not guilty    ☒
    (b) Guilty    ☐
    (c) Nolo contendere    ☐

8. If you pleaded not guilty, what kind of trial did you have? (CHECK ONE)
    (a) Jury    ☒
    (b) Judge only    ☐

9. Did you testify at the trial?

    ☒ Yes  ☐ No

## DIRECT APPEAL

10. Did you appeal from the judgment of conviction in the **California Court of Appeal**?
    ☒ Yes  ☐ No

11. If you appealed in the **California Court of Appeal**, answer the following:
    (a) Result: Judgment Affirmed

    (b) Date of result (if known): Nov.9, 1992
    (c) Case number and citation (if known): D015967
    (d) Names of Judges participating in case (if known):

    (e) Grounds raised on direct appeal:

        Trial court erred; Excluding third party culpability and Unduly restricting cross examination of witness.

12. If you sought further direct review of the decision on appeal by the **California Supreme Court** (e.g., a Petition for Review), please answer the following:
    (a) Result: Denied

    (b) Date of result (if known): Apr.27, 1994

    (c) Case number and citation (if known): D020780

    (d) Grounds raised:

        1) Ineffective Assistance of Appellate Counsel  2) Untimely Notification of Appellate Opinion  3) Prejudicial Error in Jury Instruction

13. If you filed a petition for certiorari in the **United States Supreme Court**, please answer the following with respect to that petition:  N/A
    (a)  Result: N/A

    (b)  Date of result (if known):

    (c)  Case number and citation (if known):

    (d)  Grounds raised:

## COLLATERAL REVIEW IN STATE COURT

14. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Superior Court**?
    [X] Yes [ ] No

15. If your answer to #14 was "Yes," give the following information:

    (a)  **California Superior Court** Case Number (if known):  Riverside County Superior Court
    (b)  Nature of proceeding:
         Habeas Corpus

    (c)  Grounds raised:
         6th & 8th & 14th Amendment Violations of Due process, Cruel & Unusual Punishment and Equal Protection of the law.

    (d)  Did you receive an evidentiary hearing on your petition, application or motion?
         [ ] Yes [X] No

    (e)  Result: Denied

    (f)  Date of result (if known):  May 2, 2005

16. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Court of Appeal**?
    [ ] Yes [X] No

17. If your answer to #16 was "Yes," give the following information: N/A

    (a) **California Court of Appeal** Case Number (if known):

    (b) Nature of proceeding:

    (c) Names of Judges participating in case (if known)

    (d) Grounds raised:

    (e) Did you receive an evidentiary hearing on your petition, application or motion?
       ☐ Yes ☐ No

    (f) Result:

    (g) Date of result (if known):

18. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Supreme Court**?
☐ Yes ☒ No

19. If your answer to #18 was "Yes," give the following information: N/A

    (a) **California Supreme Court** Case Number (if known):

    (b) Nature of proceeding:

    (c) Grounds raised:

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
       ☐ Yes ☐ No

    (e) Result:

    (f) Date of result (if known):

20. If you did *not* file a petition, application or motion (e.g., a Petition for Review or a Petition for Writ of Habeas Corpus) with the **California Supreme Court**, containing the grounds raised in this federal Petition, explain briefly why you did not:  N/A

## COLLATERAL REVIEW IN FEDERAL COURT

21. Is this your **first** federal petition for writ of habeas corpus challenging this parole?
    [x] Yes [ ] No    (IF "YES" SKIP TO #22)
    (a)  If no, in what federal court was the prior action filed?
        (i)  What was the prior case number?
        (ii)  Was the prior action (CHECK ONE):
            Denied on the merits?        [ ]
            Dismissed for procedural reasons?  [ ]
        (iii)  Date of decision:
    (b)  Were any of the issues in this current petition also raised in the prior federal petition?
        [ ] Yes [ ] No
    (c)  If the prior case was denied on the merits, has the Ninth Circuit Court of Appeals given you permission to file this second or successive petition?
        [ ] Yes [ ] No

---

CAUTION:

- **Exhaustion of State Court Remedies:**  In order to proceed in federal court you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court.  This means that even if you have exhausted some grounds by raising them before the California Supreme Court, you must first present *all* other grounds to the California Supreme Court before raising them in your federal Petition.

- **Single Petition:**  If you fail to set forth all grounds in this Petition challenging a specific judgment, you may be barred from presenting additional grounds challenging the same judgment at a later date.

- **Factual Specificity:**  You must state facts, not conclusions, in support of your grounds.  For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do.  A rule of thumb to follow is — state who did exactly what to violate your federal constitutional rights at what time or place.

---

## GROUNDS FOR RELIEF

22. State *concisely* every ground on which you claim that you are being held in violation of the constitution, law or treaties of the United States. Summarize *briefly* the facts supporting each ground. (e.g. what happened during the state proceedings that you contend resulted in a violation of the constitution, law or treaties of the United States.) If necessary, you may attach pages stating additional grounds and/or facts supporting each ground.

(a) **GROUND ONE**: The 2006 Board Panel Failed To Conduct A Fair And Balance Duly Considered Individualized Consideration Hearing For Petitioner Individualized Case Factors; Which Did Not Add To Further Seriousness Of The Convicted Offense; Violating The Sixth Amendment, Fourteenth Amendment And The....

Supporting FACTS:                                          cont'd p.6a

A. The Board Arbitrary Applied The Wrong Factors To Determine Petitioner's Unsuitability To A Parole Release Date.

The Ninth Circuit Court held "that California inmates continue to have a liberty interest in parole after In re Dannenberg. The Sass holding occurred subsequent to Ninth Circuit Court decision in McQuillion v. Duncan, holding that California parole sheme create a liberty interest in parole, noting that California penal code subsec.3041(b) "controls" the resolution of the question because its 'language clearly parallels the language' under consideration in Greenholtz and Allen."

The existence of a liberty interest means that a decision to deny parole must be supported by some evidence and not be otherwise arbitrary.

The protections that were developed inthe High Court Precedents Greenholtz and Allen(Parole Liberty Interest), Superintendent (Some Evidence) and Biggs(Indicia of Reliability) bestow necessary provisions in the true application of the statutory..

Did you raise GROUND ONE in the California Supreme Court?

[X] Yes [ ] No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition): petition for review.

(2) Case number or citation: S162124

(3) Result (attach a copy of the court's opinion or order if available):

## GROUNDS FOR RELIEF

(a) GROUND ONE: cont'd...

State and Federal Equal Protection Clause.

Supporting FACTS: cont'd...

language found in California penal code 3041 et seq. and the Board
of Parole Hearing Rules and Regulations Article 11. subsec.2400
et sequence.

The 2006 Board panel failed to establish a reasonableness in its
decisions that found the prisoner unsuitable for parole for two
years(Ex.A.2006 BPH Transcripts, incorporated by reference) within
the framework of the above-mentioned provisions closely related
to the due process clause.

The instant case, the Board "arbitrary" held that the prisoner
"poses an unreasonable risk of danger to public safety", based on
no evidence of reoccurring violence(Div.3 Title 15 subsec.3315.
Serious Rule Violations.(a)(1)(2)(A)(B)(C)(D)), factual information
constituting Administrative Determinants and Circumstances in
Aggravation of the Base Term or CIRCUMSTANCES IN AGGRAVATION of the
Additional Term for Other Crimes.

There is no current risk assessment that indicate the presence of
a psychiatric or psychological condition related to the prisoner's
criminality which creates a high likelihood that new serious
crimes will be committed if released.

In light of his prior record, the panel failed to duly consider the
nature of the pre-offenses, which the "gravity and timing" omits
elements of prior assaultive behavior or a significant pattern of
increasing serious criminal conduct.

The entire record lacks any circumstances or enhancements that add
to the seriousness of petitioner's convicted offense that constitute
a current threat to the public order and public safety as high-
lighted in Attempted Murder Circumstances Category IV.

Supporting FACTS: cont'd...

This is in clear error of the duly consideration of all relevant(factual) information that must reliably connect the prisoner's convicted offense that add to further seriousness of the crime in the record that a reasonable person could indicate, petitioner would present a <u>current threat</u> to public safety exceeding his minimum eligible parole date on his actual life term in July 2005 and most importantly, his second subsequent parole consideration hearing held on November 14, 2006. This is the hearing petitioner is asserting his constitutional claims.

B. <u>The State Court's Decision Departed From And Is Contrary To Whether The "Some Evidence" Standard Was Met.</u>

Case law asserts that the "some evidence" standard must point to factors in the record that is "especially egregious" and "exceptional" circumstances of aggravation that are duly considered in compliance with the arrest , charge, conviction and sentencing information relevant to the setting of a parole release date for the potential parolee of a indeterminate sentence. In the instant case, the court has to reason that the prisoner's arrest history, prior convictions and his indetermine life sentence, call. p.c.664(a)/189 with enhancements p.c. § 12022.5(a) and 12022.7, does not constitute circumstances of aggravation (p.c.654) to impose a standard of review that is less stringent than the "some evidence" test set forth <u>in re Powell.</u>

Under the BPH matrix scheme for indeterminate life sentences for other than murder by degrees(i.e. attempted murders), petitioner contends that <u>no circumstances exist</u> for good cause that add further tothe seriousness of the convicted offenses, that creates an indefinite presumption of a more culpable element of the inmate's crime to be more than minimally necessary to convict him/her of the offense for which he/she is confined.

(6b)

Supporting FACTS: cont'd...

Furthermore, the opposing district attorney failed to introduce new relevant information that would prevent the potential parolee from fulfilling his parole plans and parole conditions espoused and implied in california statutes(FOR LIFE TERM PRISONERS) beyond mere consideration-as a rehabilitative goal.

The 2006 panel failed to duly consider all requirements of a viable plan, which include parole conditions.

Considering, parolees remain under the legal supervision and jurisdiction of the Department of Corrections and Rehabilitation and can be returned to prison at any time within the legislative authority of california's law.

In addition, parolees are also subject to conditions that govern their residence, associations, ability to travel, use of intoxicants and broader aspects espoused under special conditions of parole.

Parole conditions must be duly considered in every parole consideration hearing as a procedural safeguard to ensure a prisoner's right to present a viable parole plan and to have all relevant information duly considered.

Petitioner, also contends that the 2006 panel inappropriately considered alleged aggravations outside of the factual determination of the entire record; based on assumptions of the victim's vulnerability and the inmate's motives as a fact finding for present unsuitability.

The panel failed to duly consider any post-conviction mitigating circumstances related to rehabilitative efforts that met the standard for parole suitability and release from custody.

In this case, all relevant information should have included:

Petitioner maintained long standing relationships with others without arrest, charge, and conviction of assualtive behavior and possessed no juvenile record.

Petitioner is a high school graduate prior to his incarceration and

Supporting FACTS: cont'd...

have never been known to be a gang member or possess gang ties, a habitual criminal or been involved in tumulteous relationships with others. Also, prior to his adult years he was employable and maintained a steady work history and demonstrated normal development as an adolescent.

Therefore, the board decisions and the reasons cited verbatum on the record from the underlying offense alone does not comport with a fair and balance hearing that duly considered petitioner's Individualized Case Factors in review of the entire picture in his alleged 2006 Individualized Consideration Hearing without an arbitrary and capricious determination in light of clearly established federal law.

The state court decision is objectively unreasonable and prejudicial ; Allowing the board to use allegations outside of the record to support "some evidence" any evidence to find petitioner unsuitable for parole. This is a clear abuse of discretion in violation of the due process clause.

**(b)** **GROUND TWO**: N/A

Supporting FACTS:

Did you raise <u>GROUND TWO</u> in the <u>California Supreme Court</u>?

☐ Yes ☐ No.

If yes, answer the following:

(1)    Nature of proceeding (i.e., petition for review, habeas petition):

(2)    Case number or citation:

(3)    Result (attach a copy of the court's opinion or order if available):

**(c) GROUND THREE:** N/A

**Supporting FACTS:**

**Did you raise GROUND THREE in the California Supreme Court?**

☐ Yes ☐ No.

    If yes, answer the following:

(1)    Nature of proceeding (i.e., petition for review, habeas petition):

(2)    Case number or citation:

(3)    Result (attach a copy of the court's opinion or order if available):

cv

(d)    **GROUND FOUR**:  N/A

    **Supporting FACTS**:

    Did you raise **GROUND FOUR** in the **California Supreme Court**?

       ☐ Yes  ☐ No.

If yes, answer the following:

    (1)    Nature of proceeding (i.e., petition for review, habeas petition):

    (2)    Case number or citation:

    (3)    Result (attach a copy of the court's opinion or order if available):

CIV 68 (Rev. Jan. 2006)

cv

23. Do you have any petition or appeal **now pending** in any court, either state or federal, pertaining to the judgment under attack?
☐ Yes   ☒ No

24. If your answer to #23 is "Yes," give the following information: N/A

    (a) Name of Court:

    (b) Case Number:

    (c) Date action filed:

    (d) Nature of proceeding:

    (e) Name(s) of judges (if known):

    (f) Grounds raised:

    (g) Did you receive an evidentiary hearing on your petition, application or motion?
    ☐ Yes   ☐ No

25. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
    (a) At preliminary hearing . . . . . . . . **Pro Se Litigant**

    (b) At arraignment and plea . . . . . . . **Pro Se Litigant**

    (c) At trial . . . . . . . . . . . . . . . . . . . . . **Pro Se Litigant**

    (d) At sentencing . . . . . . . . . . . . . . . **Pro Se Litigant**

    (e) On appeal . . . . . . . . . . . . . . . . . **Pro Se Litigant**

    (f) In any post-conviction proceeding .

    (g) On appeal from any adverse ruling in a post-conviction proceeding:

CIV 68 (Rev. Jan. 2006)

-10-

cv

**26.** Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
☐ Yes   ☒ No

**27.** Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
☐ Yes   ☒ No

   (a)  If so, give name and location of court that imposed sentence to be served in the future:

   (b)  Give date and length of the future sentence:

   (c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
    ☐ Yes   ☒ No

**28.**  Consent to Magistrate Judge Jurisdiction

In order to insure the just, speedy and inexpensive determination of Section 2254 habeas cases filed in this district, the parties may waive their right to proceed before a district judge and consent to magistrate judge jurisdiction. Upon consent of all the parties under 28 U.S.C. § 636(c) to such jurisdiction, the magistrate judge will conduct all proceedings including the entry of final judgment. The parties are free to withhold consent without adverse substantive consequences.

The Court encourages parties to consent to a magistrate judge as it will likely result in an earlier resolution of this matter. If you request that a district judge be designated to decide dispositive matters, a magistrate judge will nevertheless hear and decide all non-dispositive matters and will hear and issue a recommendation to the district judge as to all dispositive matters.

You may consent to have a magistrate judge conduct any and all further proceedings in this case, including the entry of final judgment, by indicating your consent below.

Choose only one of the following:

☐ Plaintiff consents to magistrate judge jurisdiction as set forth above.

**OR**

☒ Plaintiff requests that a district judge be designated to decide dispositive matters and trial in this case.

**29.**  Date you are mailing (or handing to a correctional officer) this Petition to this court:

CIV 68 (Rev. Jan. 2006)

cv

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_____

SIGNATURE OF ATTORNEY (IF ANY)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

_07/10/08_____

(DATE)

SIGNATURE OF PETITIONER

Court of Appeal, Fourth Appellate District, Div. 1 - No. D052110
**S162124**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re TROY A. BARTHOLOMEW on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

MAY 2 1 2008

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**
Chief Justice

COURT OF APPEAL - FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

F I L E D
Stephen M. Kelly, Clerk

MAR 1 4 2008

Court of Appeal Fourth District

In re TROY A. BARTHOLOMEW

on

Habeas Corpus.

D052110

(San Diego County
Super. Ct. No. CR124142)

THE COURT:

The petition for writ of habeas corpus has been read and considered by Presiding Justice McConnell and Associate Justices Benke and Aaron.

In 1992 a jury convicted petitioner Troy Bartholomew of attempted first degree murder. The jury also found true related firearm and great bodily injury enhancements. The trial court sentenced Bartholomew to a prison term of life with the possibility of parole plus 12 years. He became eligible for parole in 2005.

The circumstances of the commitment offense are as follows: Bartholomew asked an acquaintance, Dr. Hassen Seedat, for a ride to work. Dr. Seedat agreed. At some point during the drive, Bartholomew asked Dr. Seedat for money and Dr. Seedat told Bartholomew that he had none to give. Dr. Seedat subsequently stopped for gas and, when he reentered the car, Bartholomew pointed a gun at Dr. Seedat's face. Dr. Seedat asked Bartholomew what he was doing and Bartholomew replied, "pow." Bartholomew then put the gun away. He told Dr. Seedat that the gun was only a toy and that he was just trying to scare him. Becoming afraid, Dr. Seedat asked Bartholomew where he could drop him off. As Dr. Seedat started driving, Bartholomew pulled the gun out again, loaded it, and fired it at Dr. Seedat five times. Four shots hit Dr. Seedat: one in the arm, one in the shoulder, one in the jaw, and one in the back of the head.

Bartholomew had no clear motive for the crime and, until as recently as 2004, he denied having even committed it. He now accepts full responsibility for the crime and admits his judgment and decision-making processes were impaired at that point in his life, in part because of his poly-substance abuse.

Bartholomew's criminal history includes multiple convictions for theft-related and substance abuse-related crimes. In addition, at the time of the commitment offense, he was on probation for first degree burglary.

During his incarceration, Bartholomew has received three disciplinary actions and four disciplinary counselings. The most recent disciplinary action was in 1995 and the most recent disciplinary counseling was in 1993.

Bartholomew had completed high school prior to his incarceration and, during his incarceration, he has completed some college level general education coursework. In addition, he has completed vocational training in landscaping, silk-screening, and shoe repair. He is also a talented artist and hopes to obtain training in graphic arts or some similar field that would allow him to earn a living with his talent. He currently works in the prison kitchen, receiving average to exceptional ratings.

Upon parole, Bartholomew plans to live in San Diego with his fiancée. He has Diego. He has also developed contacts with employment agencies, job referral agencies, and community services agencies in San Diego that can help him transition from incarceration to parole.

Bartholomew has completed several prison self-help programs, including anger management, communication skills, victim awareness, stress management, and rehabilitation techniques. He is currently participating in Alcoholics Anonymous, Narcotics Anonymous, and Criminon programs.

The most recent mental health evaluation of Bartholomew indicates that he does not have any psychiatric or thought disorders. The evaluation also indicates that Bartholomew's danger risk upon parole "would not be significantly greater than that of an average citizen in society."

In November 2006, after considering the above information, the Board of Parole Hearings (Board) found Bartholomew unsuitable for parole. The Board based its decision on the circumstances of the commitment offense as well as Bartholomew's other criminal history, which includes some assaultive behavior. Regarding the circumstances of the commitment offense, the Board found that the crime was especially cruel and callous. The Board also found that Bartholomew carried out the crime in a dispassionate and calculated manner. Of particular concern to the Board was the inexplicable motive for the crime. Because of this and the fact that Bartholomew had only recently accepted responsibility for the crime, the Board could not confidently determine Bartholomew's level of insight into the crime. Consequently, the Board found that Bartholomew remained unpredictable and a threat to public safety.

Bartholomew filed this petition challenging the Board's decision. We conclude Bartholomew has failed to state a prima facie case for relief. (*People v. Duvall* (1995) 9 Cal.4th 464, 474-475.)

In reviewing the decision of the Board to deny parole, this court's inquiry is limited to determining whether there is some evidence in the record to support the Board's decision, based on factors specified by statute and regulation. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658.) In this case, the record, as described above, contains ample evidence to support the Board's decision. The record also establishes that the Board relied upon appropriate factors in reaching its decision. (Cal. Code Regs., tit. 15, § 2402.) The Board did not, as Bartholomew contends, ignore the factors tending to show suitability. To the contrary, the Board reviewed each of these factors and was highly complimentary of Bartholomew's prison programming. The Board simply concluded that the factors tending to show unsuitability currently outweigh the factors tending to show suitability. Our standard of review does not permit us to reweigh these factors. (*Rosenkrantz, supra*, 29 Cal.4th at p. 679.)

The petition is denied.

_____
AARON, Acting P. J.

Copies to:  All parties

3

AUG 1 0 2007

By C TARAS, Deputy

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN DIEGO

IN THE MATTER OF THE APPLICATION OF:    )   HC 18988
        )   CR 124142
TROY BARTHOLOMEW,         )
        )   ORDER DENYING PETITION FOR
        Petitioner.   )   WRIT OF HABEAS CORPUS
        )
        )
_____)

      UPON REVIEW OF THE PETITION FOR WRIT OF HABEAS CORPUS THE

COURT FINDS:

      On December 26, 1991, the Court sentenced Petitioner to the indeterminate term of life

plus 12 years for one count of attempted first-degree murder (Penal Code §§ 187(a)/664/189) and

the allegation that he personally used a firearm (Penal Code § 12022.5(a)) and caused great

bodily injury (Penal Code § 12022.7), the offenses for which a jury had found him guilty on

November 15, 1991.

      Petitioner filed a timely appeal, but on or about November 9, 1992, the Fourth District

Court of Appeal affirmed the judgment.

      Petitioner's actual life term began on July 12, 1998, and his minimum eligible parole date

was July 12, 2005. The first parole consideration was held on September 8, 2004, at which time

Petitioner was found unsuitable for parole for two years. The first subsequent parole

consideration hearing was held on November 14, 2006, and at the end of that hearing the Board

1   of Parole Hearings (BPH) denied Petitioner's parole for two years. This Petitioner's next parole

2   suitability is scheduled to take place sometime in 2008.

3          Petitioner has now filed the present petition for writ of habeas corpus challenging that

4   decision, based on grounds that the BPH is depriving him of a federally protected liberty interest

5   in parole, that the BPH conducted the hearing improperly on procedural grounds and that the

6   BPH failed to provide due consideration of the factors tending to show suitability. In summary,

7   Petitioner claims he was found unsuitable for parole with no evidence to support or substantiate

8   these findings.

9          This present Petition is denied for the following reasons.

10         **First**, for whatever reason, Petitioner has failed to provide pages 28 through 43 of the

11  transcript from the November 14, 2006, hearing, including the first two pages of the BPH's

12  decision. It is unknown whether this omission was purposeful because Petitioner does not want

13  the Court to review the entire record, or by simple neglect to send the entire record.

14         Regardless of the reason, however, without the ability to review the entire record this

15  Court must deny the Petition. A Petitioner in habeas corpus bears the burden of proving the facts

16  upon which he bases his claim for relief.   In re Riddle (1962) 57 Cal.2d 848, 852. Every

17  Petitioner, even one filing in pro per, must set forth a prima facie statement of facts which would

18  entitle him to habeas corpus relief under existing law. In re Bower (1985) 38 Cal.3d 865, 872.

19         This burden has not been met on this reason alone.

20         Second, a review of the documentation Petitioner did provide shows that there was,

21  indeed, evidence presented to the BPH and considered by it that indicated that this Petitioner was

22  not yet suitable for parole.

23         It is clear that the BPH did consider the commitment offense and while Petitioner had the

24  right not to discuss the circumstances of that crime at the hearing, there is a strong implication

25  that the panel members would certainly have considered, and wanted to consider, what Petitioner

26  had to say about it.

27         The presiding commissioner set the tone early when she said, "Sir, I understand that it is

28  your right to exercise your right not to speak about the criminal offense. However, I will tell you

1  that at the outset that to this Panel this crime is inexplicable. This appears from what we have in

2  front of us to be a reasonable law-abiding citizen who is giving you a ride, and you got in the car,

3  and you shot him." (Transcript, page 8:10-17).

4      This same conclusion was noted several times again when the decision was being

5  rendered at the end of the hearing: "This offense was carried out in an especially cruel and

6  callous manner in that the victim . . . was particularly vulnerable as he was giving you a ride in

7  his van." (Transcript, page 44:10-13). "This offense was carried out in a dispassionate and

8  calculated manner in that . . . [Y]ou loaded the gun with bullets and then began shooting at [the

9  victim's] face hitting him four times. This offense was carried out in a manner demonstrating

10  exceptionally callous disregard for human suffering." (Transcript, page 44:16-25). "The motive

11  for this crime is moreover inexplicable. This is the most troubling part to the Panel." (Transcript,

12  page 45:8-9).

13      What also troubled the panel was that, even though the crime was committed in 1991, it

14  was not until many years later that Petitioner finally admitted commission of the offense. "In

15  2004, you claimed to the psychologist that you didn't commit this crime, and in fact, it appears

16  only recently and including today that you're taking responsibility for this offense. The Panel,

17  therefore, has to believe that your insight and therefore your understanding of the nature and

18  magnitude of this crime is as of yet undetermined, and you remained unpredictable and a threat

19  to public safety." (Transcript, page 45:17-24).

20      The BPH's comments were not all negative. "As you presented here today, and you

21  presented very well. You presented as a mature adult. You obviously have talents and have done

22  impressive programming here in the institution and other institutions. And you have embarked

23  on a program of disciplinary behavior." (Transcript, page 45: 9-14).

24      Therefore, before going any further, it is clear that the BPH believed that, even though it

25  was definitely becoming more positive, Petitioner still presented a risk to society and there were

26  other factors than just the commitment offense that prevented obtaining a parole date.

27      Petitioner asked at the end of the decision what he could do so that he could be found

28  suitable in the future. The presiding commissioner was very clear and also left no doubt

1  regarding the major basis for the decision: "If you continue the programming – right now, your

2  unsuitability just doesn't outweigh the – it outweighs rather the suitability factors that you have

3  at this time. You have suitability factors, but you also have – you have factors of unsuitability

4  that we had to consider. . . . The fact that you just recently took responsibility for this crime.

5  You've been denying this crime for a long time, and it's on record. And that's all we are to go

6  by, is that. But today, you've taken responsibility for it, as recently as 2004, you did not. So

7  that's what we have on our record, and that's what we have to deal with, sir. And that's the basis.

8  But I would encourage you to continue because you do present well, and you would be a good

9  candidate at some point." (Transcript, page 47:2-16)

10      Therefore, from what this Court was able to review, it is clear that the BPH did consider

11  the requisite factors, but the major concern was that Petitioner was just beginning to take

12  responsibility for what was an inexplicable crime that he has yet to fully explain. Together, this

13  provided an uncertainty about future behavior about which the BPH was not willing to risk at

14  this time.

15      By statute, when determining suitability for parole, the parole board "shall normally set a

16  parole release date" (Penal Code § 3041(a)) "unless it determines that the gravity of the current

17  convicted offense or offenses, or the timing and gravity of a current or past convicted offense or

18  offenses, is such that consideration of the public safety requires a more lengthy period of

19  incarceration for this individual." (Penal Code § 3041(b)). The state Legislature has given the

20  BPH the power to establish the rules and regulations regarding release on parole. (Penal Code §

21  3052.) The BPH regulations require a panel determining parole suitability for a life prisoner to

22  find the prisoner unsuitable for parole if, in the judgment of the panel, the prisoner will pose an

23  unreasonable risk of danger to society if released from prison. (California Code of Regulations,

24  Title 15 [hereafter 15 C.C.R.] §§ 2281(a), 2402(a).) The BPH should consider all relevant,

25  reliable information available to it, including the prisoner's social history, past and present

26  mental state, criminal history, commitment offenses, behavior before, during and after the crime,

27  attitudes toward the crime, and any other information that bears on the prisoner's suitability for

28  release on parole. (15 C.C.R. §§ 2281(b), 2402(b).)

The BPH has also set forth general factors that tend to show suitability and unsuitability for parole. (15 C.C.R. §§ 2281(c)-(d), 2402(c)-(d).) The following are the factors tending to show *unsuitability* for parole that the parole board should consider:

> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
> (C) The victim was abused, defiled or mutilated during or after the offense.
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
> (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
> (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.
>
> (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
> (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
> (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(15 C.C.R. § 2402(c).)

The following are the factors tending to show *suitability* for parole that the parole board should consider:

> (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
> (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.
> (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.
> (4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.
> (5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.
> (6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.
> (7) Age. The prisoner's present age reduces the probability of recidivism.
> (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
> (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

(15 C.C.R. § 2402(d)).

The precise manner in which these specified factors are considered and balanced lies within the broad discretion of the BPH, but any decision to deny parole cannot be arbitrary or capricious. In re Rosenkrantz (2002) 29 Cal.4th 616, 656-657, 677 (Rosenkrantz).) Thus, the standard is that a life prisoner such as Petitioner should be granted parole unless the BPH finds, in the exercise of its broad discretion, the prisoner is unsuitable for parole in light of the circumstances specified by statute and by regulation. (See Rosenkrantz, supra, 29 Cal.4th at 654-655.) The overriding factor in determining whether a prisoner is suitable for parole is public safety. (Penal Code § 3041; 15 C.C.R. § 2402(a); In re Dannenberg (2005) 34 Cal.4th 1061, 1084 (Dannenberg); In re Scott (2005) 133 Cal.App.4th 573, 591 (Scott).)

Judicial review of the BPH's decision whether a prisoner is suitable for parole is limited to a determination of whether the factual basis for the decision is supported by some evidence in the record presented to the parole board that has some indicia of reliability. (Rosenkrantz, supra, 29 Cal.4th at 667; Scott, supra, 133 Cal.App.4th at 590-591.) This standard of review requires only a "modicum of evidence." (Rosenkrantz, supra, 29 Cal.4th at 677.) It is within the BPH's discretion to decide how to resolve conflicts in the evidence and to decide how much weight to give each factor. (Id. at 656, 677.) "It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (Id. at 677.) As long as the BPH's decision reflects individualized consideration of the specified criteria and legal standards, and is not arbitrary or capricious, the court's review is limited to ascertaining whether there is some evidence in the record that supports the decision.

The key here is that, no matter how much or how little this Court believes that this Petitioner may or may not be suitable for parole, it can only review the case through the eyes of the law stated immediately above.

Petitioner argues that there was insufficient evidence, when all factors were considered, to deny parole. However, it is clear from the above quotations that the BPH focused on the belief that Petitioner was not yet ready for parole because, although he was following the proper approach to becoming suitable, he was not at that point yet.

1    Thus, there was more than "some evidence" to support the BPH's decision finding

2 Petitioner unsuitable for release on parole, because of all of the above, even though he had made

3 advances while being incarcerated.

4    The federal courts indeed have found the language of Penal Code § 3041 creates a liberty

5 interest in release on parole, which is protected by the procedural safeguards of the due process

6 clause. (Biggs v. Terhune (9th Cir. 2003) 334 F.3d 610, 614; McQuillion v. Duncan (9th Cir.

7 2002) 306 F.3d. 895, 902-903; see also, Rosenkrantz, supra, 29 Cal.4th at 653.) However, the

8 California Supreme Court has recently found that whether a prisoner is suitable for parole trumps

9 the prisoner's expectancy of a set parole date. (Dannenberg, supra, 34 Cal.4th at 1070-1071

10 ["The statutory scheme, viewed as a whole, thus clearly elevates a life prisoner's individual

11 suitability for parole above the inmate's expectancy in early setting of a fixed and "uniform"

12 parole date."]) Thus, there is no violation of a prisoner's liberty interest if the parole board

13 properly denied parole.

14    A decision to deny parole can be based on the nature of the prisoner's underlying offense

15 alone, as long as the parole board has given due consideration to all applicable factors regarding

16 suitability for parole (Rosenkrantz, supra, 29 Cal.4th at 677, 682-683; see also, Scott, supra, 133

17 Cal.App.4th at 594-595), and the circumstances of the commitment offense reasonably could be

18 considered more aggravated or more violent than the minimum necessary to sustain a conviction

19 for that offense (Rosenkrantz, supra, at 678, 683; see also, Dannenberg, supra, 34 Cal.4th at

20 1098.)

21    Certainly this BPH panel considered the circumstances surrounding the inexplicable

22 shooting which resulted in the great bodily injuries of someone vulnerable because he was

23 simply providing an acquaintance a ride. But it is also obvious that the panel was not basing its

24 parole suitability denial on the commitment offense alone. In fact, there was a strong implication

25 at the end of the decision that parole may be in Petitioner's future when the commissioner said

26 that he could be a good candidate for the future if he continued his upward progress.

27    The parole board in this case did not rely solely on Petitioner's commitment offense in

28 denying him parole as discussed above. A careful reading of the portion of the transcript of the

hearing and decision that was provided shows that the BPH gave due consideration to all the applicable factors regarding suitability for parole as set forth in 15 C.C.R. §2402(c), (d).

After·weighing the above factors, the BPH apparently determined the positive aspects did not outweigh the unsuitability for parole, and denied parole until another hearing, apparently set for sometime now in 2008.

Thus, based on the above, there is "some evidence" in the record to support the BPH's finding that Petitioner is unsuitable for parole. This Court finds no abuse of the BPH's discretion is apparent in this case.

This Court makes no ruling or holding on the positive or negative merit of this or any other Petitioner's arguments. While Petitioner may not appeal this decision, he has the right to present his issues to a higher court in a different habeas corpus petition.

The petition for writ of habeas corpus is DENIED for the reasons stated.

A copy of this order shall be served on the (1) Petitioner at the address noted on the title page of the petition, and (2) the Appellate Division of the Office of the San Diego District Attorney.

IT IS SO ORDERED.

DATED: ___8 / 10 / 07___

RICHARD S. WHITNEY
JUDGE OF THE SUPERIOR COURT

# PROOF OF SERVICE BY MAIL

I THE UNDERSIGNED, CERTIFY THAT I AM OVER THE AGE OF EIGHTEEN (18) YEARS OF AGE, THAT I

CAUSED TO BE SERVED A COPY OF THE FOLLOWING DCOUMENT:

ENTITLED: __Petition For Writ of Habeas Corpus__

__Under 28 U.S.C. § 2254__

_____

BY PLACING THE SAME IN AN ENVELOPE, SEALING IT BEFORE A CORRECTIONAL OFFICER.

AND DEPOSITING IT IN THE | _UNITED STATES MAIL_ | AT AVENAL STATE PRISON AND ADDRESSEDIT

TO THE FOLLOWING:

SOUTHERN DISTRICT OF CALIFORNIA
880 Front St., Rm. 4290,
San Diego., CA   92101-8900
Att: W. Samuel Hamrick Jr.

EXECUTED ON __July__, __10__ 20 __08__ AT AVENAL STATE PRISON, AVENAL CALIFORNIA

I __Troy Bartholmew__ DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAW

OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

SIGNATURE OF DECLARANT

Mr. __Troy Bartholmew__
PRINT NAME OF DECLARANT

PRO PER.

EXHIBIT A: 2006 SUBSEQUENT PAROLE CONSIDERATION
HEARING TRANSCRIPTS AND ABSTRACT OF
JUDGMENT FOR COMMITMENT TO STATE
PRISON

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )      CDC Number H-18717
Hearing of: )
 )
TROY BARTHOLOMEW )
_____ )

AVENAL STATE PRISON

AVENAL, CALIFORNIA

NOVEMBER 14, 2006

1:54 P.M.

PANEL PRESENT:

Ms. Sandra Bryson, Presiding Commissioner
Mr. Bill Keenan, Deputy Commissioner

OTHERS PRESENT:

Mr. Troy Bartholomew, Inmate
Mr. Anthony Hall, Attorney for Inmate
Correctional Officers, Unidentified

INMATE
COPY

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No          See Review of Hearing
_____ Yes         Transcript Memorandum

--------------------------------------------------------------

Priscilla Baker        Vine, McKinnon & Hall

1

1    **P R O C E E D I N G S**

2    **DEPUTY COMMISSIONER KEENAN:**  We're on record.

3    **PRESIDING COMMISSIONER BRYSON:**  Okay.  This is the

4    first subsequent parole consideration hearing for Troy

5    Bartholomew, CDC number, H Henry, 18717.  Today's date is

6    November 14th, 2006, and the time is 13:54.  We're

7    located at Avenal State Prison.  The inmate was received

8    January 2, 1992, from San Diego County.  The life term

9    began July 12th, 1998.  The minimum eligible parole date

10   is July 12th, 2005.  Charging in case number CR, that's

11   Charles Robert, 124142, Count Number 1, the controlling

12   offense Penal Code 664 slash 187 (A) attempted murder

13   first with Penal Code 12022.5 (A) use of a handgun, Penal

14   Code 12022.7, special allegation of great bodily injury

15   with controlling -- or excuse me, with non-controlling

16   offenses.  San Diego case number CRN, that's Charles,

17   Robert, Nancy, 15678, Count 2, Penal Code 459 burglary

18   first, and San Diego, Charles, Robert, 101305 in Count 1,

19   Vehicle Code 10851 A, theft of vehicle, for which the

20   inmate received a term of life plus 12 years.  This

21   hearing is being recorded.  For the purpose of voice

22   identification, each of us will state our first and last

23   name, spelling the last name.  After you spell your last

24   name, sir, please state your CDC number.  I will start

25   and then go to my right.  Sandra Bryson, B-R-Y-S-O-N,

26   Commissioner Board of Parole Hearings.

27   **DEPUTY COMMISSIONER KEENAN:**  Bill Keenan,

2

1    K, double E, N-A-N, Deputy Commissioner.

2        **ATTORNEY HALL:** Anthony Hall, H-A-L-L, attorney for

3    Mr. Bartholomew.

4        **INMATE BARTHOLOMEW:**  Troy Bartholomew,

5    B-A-R-T-H-O-L-O-M-E-W, H-18717.

6        **PRESIDING COMMISSIONER BRYSON:**  All right.  Thank

7    you.  And I note for the record, we have two correctional

8    peace officers in the room who are here for security

9    purposes.  And Commissioner Keenan, is there any

10   confidential material in the file.  And if so, will it be

11   used today?

12       **DEPUTY COMMISSIONER KEENAN:**  We do have confidential

13   information.  It will not be used unless otherwise

14   specified during the course of this hearing.

15       **PRESIDING COMMISSIONER BRYSON:**  Thank you.  All

16   right.  I've passed the hearing checklist marked Exhibit

17   1 to your attorney, sir, to insure that we're all

18   proceeding with the same set of documents.  And I noticed

19   that your attorney has initialed the hearing checklist,

20   so that therefore, sir, I believe you have all the

21   documents; is that correct?

22       **ATTORNEY HALL:**  Partially.  With the exception of

23   this sentencing transcript, we have all the documents,

24   but we didn't get a copy of the sentencing transcript.

25       **PRESIDING COMMISSIONER BRYSON:**  Of the sentencing.

26   I will make note of that.  I'm not sure if it's in my

27   packet or not.  We will look into that.  Thank you.  And

3

1    I was just handed by the officer, I believe you are

2    submitting additional documents; is that correct?

3        **ATTORNEY HALL:**  That's correct.

4        **PRESIDING COMMISSIONER BRYSON:**  All right.  And sir,

5    today you and your attorney signed the form marked

6    Exhibit 2 regarding ADA accommodation hearing procedures

7    and inmate's right.  And counsel, do you have any

8    comments or concerns regarding the ADA rights or this

9    inmate's ability to participate in this hearing?

10       **ATTORNEY HALL:**  No Commissioner.

11       **PRESIDING COMMISSIONER BRYSON:**  Thank you.  Are

12   there any preliminary objections?

13       **ATTORNEY HALL:**  There is none.

14       **PRESIDING COMMISSIONER BRYSON:**  Will the inmate be

15   speaking with the Panel today?

16       **ATTORNEY HALL:**  The inmate will be discussing all

17   issues at the discretion of the Board, except he will not

18   discuss the facts and circumstances of the commitment

19   offense.  He has accepted and hopes the Board will accept

20   the official record of his conduct in the crime.

21   However, he will not discuss the facts and circumstances

22   of the crime.

23       **PRESIDING COMMISSIONER BRYSON:**  All right.  Well, if

24   you're going to speak to us at all, I need to swear you

25   in.  So would you raise your right hand, please.  Do you

26   solemnly swear or affirm that the testimony you give at

27   this hearing will be the truth, the whole truth, and

4

1    nothing but the truth? . . .

2        **INMATE BARTHOLOMEW:**  Yes, ma'am.

3        **PRESIDING COMMISSIONER BRYSON:**  Okay.  Sir, it would

4    probably be a good idea if you could pull that a little

5    closer to you.  Thank you.  I'm not sure -- All right.

6    Thank you, officer.  Okay.  I'm going to read the facts

7    of the crime into the record as set forth in the

8    appellate decision, and this is Court of Appeals State of

9    California 4th Appellate District, Division 1, People V

10   Troy Anthony Bartholomew.  This is, D David, 015967

11   Superior Court No. CR 124142, and this was filed November

12   9th of 1992, and starting on page one as to factual and

13   procedural background.

14        "On June 25th, 1991, Dr. Hassen Seedat, that's

15        S-E-E-D-A-T, an active member of the Muslim

16        community rented an apartment at the Winone

17        Apartment Complex in San Diego, all though his

18        principal residence was in El Centro.  He knew

19        a number of Muslims who lived in his complex

20        through his religion.  Seedat first met

21        Bartholomew as Abdul, that's A-B-D-U-L, Oawi,

22        O-A-W-I, in 1990 in the apartment complex's

23        prayer room.  Between September 90th, 1990, and

24        June 1991, Seedat saw Bartholomew on four or

25        five occasions.  Bartholomew worked at the

26        complex as a janitor and in the garden.  Dr.

27        Seedat testified the following occurred on June

5

1    25th.  At approximately 9:00 a.m., he was

2    walking toward his van in a parking lot when

3    Bartholomew approached and asked him for a ride

4    to work.  The two entered the van and Seedat

5    drove from the rear to the front of the complex

6    where they stopped to wait for a man named

7    Dawud, D-A-W-U-D, who was joining them.  Around

8    9:30 Bartholomew went to look for Dawud.  After

9    he returned, Seedat waited 10 to 15 minutes

10   longer.  He then went looking for Dawud.

11   Eventually they left without Dawud around

12   10:30.  After stopping at a post office, Seedat

13   stopped for gas.  When he reentered the car,

14   Bartholomew pointed the gun at his face.  When

15   Seedat asked what Bartholomew was doing,

16   Bartholomew replied, quotes "Pow" end quotes.

17   And said it was only a cap gun, and he was

18   trying to scare him.  Bartholomew put the gun

19   away.  After Seedat pulled away, Bartholomew

20   again pulled the gun.  He shot Seedat five

21   times, hitting him in the arm, shoulder, jaw,

22   and back of the head.  A nearby resident heard

23   the shots.  He saw a black man in his mid 20's,

24   5 foot 11 inches and a 150 to 160 pounds,

25   wearing a black tee shirt jog from the scene.

26   A second witness was walking down the street

27   when she heard the shots.  She saw a man

6

1    approximately 6 feet 1 inch weighing 160 or 170

2    run from the scene.  San Diego police officer

3    Julie Chavez, that's C-H-A-V-E-Z, was in a

4    patrol car a block a way.  She went to the

5    scene and Seedat said he had offered a friend

6    Abdul a ride to work.  The friend shot him and

7    fled.  Seedat described Abdul as a thin 5 foot

8    9 inch black male in his 20's wearing a black

9    tee shirt.  On June 28th, a San Diego police

10   officer went to the Winone Apartments.  With

11   the assistance of a K-9 officer, Bartholomew

12   was found hiding in a linen closet."

13   This inmate has no note of juvenile record.  And I

14   will incorporate by reference this inmate's prior

15   history per the California Identification

16   Investigation Account commonly called the CI&I wrap

17   sheet account of his criminal history noting that

18   during a three-year period culminating in the life

19   crime, this inmate was convicted for a number of

20   crimes including vehicle theft, stolen property,

21   presenting false ID (inaudible) and DUI, driving

22   under the influence, controlled substance, and

23   driving suspended, also a burglary in Oceanside.

24   And I would also like to read into the record the

25   personal factors and then we'll talk about your

26   personal history with the extent that you would like

27   to talk about it.  As to the Board packet dated

1  September 2006, this is authored by D period Tavak,

2  T-A-V-A-K, the correctional counselor one.  As to

3  personal factors on page three of the Board report.

4  Bartholomew was born and raised by his grandmother

5  Luella Mitchell in New Orleans, Louisiana, after his

6  birth mother Arnolla Mitchell was murdered.  He was

7  seven years old when she was killed of a gunshot.

8  His grandmother moved him out with her to California

9  shortly thereafter, and she passed away when she was

10  about 21 years of age.  His father Paul Bartholomew

11  divorced his mother, and Bartholomew still thinks he

12  still resides in New Orleans as a retired

13  businessman.  Does not maintain any contact with

14  him.  He has three brothers and three sisters:  Paul

15  Bartholomew, 45, a carpenter in San Diego.  Receives

16  calls and writes to him, no visits.  Miguel

17  Humphrey, 38, unknown.  Rudy Humphrey, 25, roofer in

18  San Diego, calls and writes him.  No visits.  Shonna

19  Brooks, that's S-H-O-N-N-A, Brooks, 49, housewife,

20  San Diego, calls and writes him.  No visits.  Ann

21  Rosenell, R-O-S-E-N-E-L-L, Maxwell, 47, housewife,

22  North Carolina, writes to him.  And Patrice

23  Humphrey, 30, unknown.  He has an 18-year-old

24  daughter Arnolla Bartholomew who is currently going

25  to college in Texas.  She lives with her mother.

26  That's Phlysta, P-H-L-Y-S-T-A, Russell, and has had

27  recent contact with him prior to leaving the state

8

1    for school.  Phlysta Russell and Bartholomew never

2    married.  Bartholomew did later marry Margaret

3    Collins, but the marriage lasted only one year and

4    end shortly after his coming to prison.  Bartholomew

5    stated he graduated in 1983 from Morris High School

6    in San Diego California.  Has held numerous jobs

7    including roofer, painter, bagging, working on

8    resurfacing yachts, and maintenance of apartments.

9    He stated he began using drugs when he was

10    approximately 18 years old.  All right.  Sir, I

11    understand that it is your right to exercise your

12    right not to speak about the criminal offense.

13    However, I will tell you that at the outset that to

14    this Panel this crime is inexplicable.  This appears

15    from what we have in front of us to be a reasonable

16    law-abiding citizen who was giving you a ride, and

17    you got in the car, and you shot him.  And it's just

18    amazing he did not die under these circumstances

19    having been shot four times, basically wounded four

20    times.  He was -- one of them to the head.  And one

21    going across his throat, the third shot entering his

22    jaw, and a shot going under the shoulder and lodging

23    at the base of his neck.  It's just an amazing fact

24    that he survived.  And so what will help us in this

25    regard even though you don't wish to speak about the

26    crime.  What will help us perhaps understand this a

27    bit is if there's material or information you'd like

9

1    to include and tell us about your prior history to

2    see what could have led you to be in such a state.

3    You do have a prior criminal history.  And you were,

4    I believe, on probation at the time of the

5    commitment offense, which is that true?

6        INMATE BARTHOLOMEW:  Yes, ma'am.

7        PRESIDING COMMISSIONER BRYSON:  Yes.  Okay.

8    Would you like to explain what was going on with

9    your life so that you were in this up until the life

10   crime?  What happened in your crime to bring you to

11   this?

12       INMATE BARTHOLOMEW:  I think in my life at the

13   particular time, I was just doing things that were

14   unconscious.  That were not, you know, very decision

15   things.  And I can't blame and say that anyone led

16   me to that or helped me do that because I have to

17   take the responsibility myself.  But things in life

18   in which I was doing was very unconscious.  I wasn't

19   thinking very clearly at that particular time nor

20   were my actions reflecting of the thoughts or

21   behavior.

22       PRESIDING COMMISSIONER BRYSON:  Were you a drug

23   user?

24       INMATE BARTHOLOMEW:  Yes, ma'am.

25       PRESIDING COMMISSIONER BRYSON:  Okay.  And when

26   did that start?  When did you start using drugs?

27   Was it drugs and alcohol?  Was it just drugs?  What

10

1    was it?

2         **INMATE BARTHOLOMEW:**  Drugs and alcohol.

3         **PRESIDING COMMISSIONER BRYSON:**  Drugs and

4    alcohol.  How did you get started down that road; do

5    you know?

6         **INMATE BARTHOLOMEW:**  I think that was beginning

7    like  (inaudible) of that nature.  You know,

8    experimenting, first and foremost with marijuana and

9    alcohol and then graduated to liquor and things of

10   that nature.  These things in my mind today with

11   high insight create a factor in impairing my

12   judgment or, you know, my decision making process.

13        **PRESIDING COMMISSIONER BRYSON:**  Okay.  So

14   during this time frame, actually, the run up to the

15   crime, you were 26-year-old old, almost 27,

16   actually.  So you weren't a little kid?

17        **INMATE BARTHOLOMEW:**  Not really.

18        **PRESIDING COMMISSIONER BRYSON:**  And you were

19   still on probation for the crime in Oceanside.  That

20   was a robbery -- well, we have a robbery and a

21   burglary, first-degree burglary.  You were sentenced

22   to five years formal probation for that.  And do you

23   remember that crime?

24        **INMATE BARTHOLOMEW:**  Yes.

25        **PRESIDING COMMISSIONER BRYSON:**  What happened?

26        **INMATE BARTHOLOMEW:**  I went to Oceanside with a

27   friend or someone I considered at the time a friend,

1   and we were supposed to, you know, go and party, but

2   it didn't turn out that way.  We went and got

3   something to drink.  I sat outside on the porch, you

4   know, by the store, and later on he comes out and

5   tells me let's go.  And after a while the police

6   come pick us up and ask me what was going on.  I

7   didn't know.  I never entered the house.  I never

8   saw anybody.  And you know, then there was actually

9   on me, but I took responsibility for being with him.

10      **PRESIDING COMMISSIONER BRYSON:**  Let's maybe

11   back up a little bit.  You graduated from high

12   school.

13      **INMATE BARTHOLOMEW:**  Yes, ma'am.

14      **PRESIDING COMMISSIONER BRYSON:**  Were you on

15   drugs in high school?

16      **INMATE BARTHOLOMEW:**  No, ma'am.  No, ma'am.

17      **PRESIDING COMMISSIONER BRYSON:**  And so actually

18   you had a good start to a career?

19      **INMATE BARTHOLOMEW:**  Yes.

20      **PRESIDING COMMISSIONER BRYSON:**  How would you

21   characterize your family life when you grew up?

22      **INMATE BARTHOLOMEW:**  Pretty stable.  Pretty

23   good.

24      **PRESIDING COMMISSIONER BRYSON:**  It appears to

25   be.  You had some unfortunate terrible things

26   happen.  Your mom was killed.  That was pretty

27   terrible.  Did that affect you deeply or were you

12

1   pretty young when that happened?

2        **INMATE BARTHOLOMEW:**  I was young.  But later on

3   it may have played a factor somehow.  I mean people

4   would talk about their mothers, and ask where mine

5   was, of course, I would have to tell them deceased

6   or dead.  But I can't say that that was something

7   that made me do anything that was wrong or make me

8   do anything that was deviant in society.  You know,

9   maybe at a younger or earlier point in my life,

10  maybe I was looking for someone or something to

11  blame my own wrong and faulty actions on, but I

12  can't necessarily say that that was the cause.  It

13  was me that was the cause.

14       **PRESIDING COMMISSIONER BRYSON:**  So you're

15  grandmother raised you afterwards, and then you came

16  out to California.  Now, what happened out here?

17  Did your grandmother until she passed away; were you

18  basically living with her or what happened?

19       **INMATE BARTHOLOMEW:**  Yes, ma'am.

20       **PRESIDING COMMISSIONER BRYSON:**  And what about

21  your siblings brothers and sisters or whatever?

22       **INMATE BARTHOLOMEW:**  The younger ones were

23  living with her also.

24       **PRESIDING COMMISSIONER BRYSON:**  I see.

25       **INMATE BARTHOLOMEW:**  Not the older ones.

26       **PRESIDING COMMISSIONER BRYSON:**  How have they

27  turned out?  Anybody in prison in the rest of your

13

1    family?

2        **INMATE BARTHOLOMEW:**  I'm the only one.

3        **PRESIDING COMMISSIONER BRYSON:**  That's good.

4    Okay.  It sounds like you still have communications

5    with quite a bit of your family; is that correct?

6        **INMATE BARTHOLOMEW:**  Yes, ma'am.

7        **PRESIDING COMMISSIONER BRYSON:**  Okay.  So what

8    were you interested in life?  What were doing?  Were

9    you working at that time after you graduated from

10   high school?

11       **INMATE BARTHOLOMEW:**  Yes, ma'am.

12       **PRESIDING COMMISSIONER BRYSON:**  What were you

13   doing?

14       **INMATE BARTHOLOMEW:**  I did roofing.  I did

15   bagging.  I did painting.  I did a host of jobs.  I

16   worked for Holiday Inn.  I worked for Rain Water's

17   Restaurant.  That was a pretty upscale restaurant.

18   And it was all right.

19       **PRESIDING COMMISSIONER BRYSON:**  Okay.  Well,

20   what were your plans?  Were you supporting a job

21   habit at this time then while you were out working?

22       **INMATE BARTHOLOMEW:**  No.

23       **PRESIDING COMMISSIONER BRYSON:**  So how did you

24   get into drugs in a heavy way?

25       **INMATE BARTHOLOMEW:**  I believe it started as a

26   fun thing and then it escalated not knowing the

27   limits of what I could drink, what I could smoke, or

14

1    you know, I just never knew when to call it quits

2    except when I was going to work. And it became more

3    and more escalated over the weekend. And then it

4    stopped from being on the weekends or starting going

5    through throughout the week. So I believe that I

6    became more, I guess, pronounced.

7        **PRESIDING COMMISSIONER BRYSON:** Okay. Is there

8    anything else about your personal factors that's

9    your early life prior to the crime that you'd like

10   to add to help us understand you?

11       **INMATE BARTHOLOMEW:** You know, again, I'd like

12   to take the responsibility for my own actions.

13   Knowing that it was me, but during the time in my

14   life, I believe that as when my grandmother passed

15   away, that was the time when drinking really started

16   playing a factor or I started drinking a little more

17   heavier and started doing things a little more that

18   was deviant in society. Because up until that time,

19   I held jobs. I lived on my own. I paid rent. And

20   I did things that a normal citizen in society would

21   do, but again, I can't say that, you know, because

22   my grandmother died, because I had some misfortunes

23   in life that this was the cause of any own behavior.

24   You know, I just wasn't in control of my own self,

25   and I made faulty decisions at that particular time.

26   And I know that now that I did.

27       **PRESIDING COMMISSIONER BRYSON:** Okay. Well, if

15

1    you'll turn your attention now to Commissioner

2    Keenan.

3         **ATTORNEY HALL:**  Commissioner, may I have just

4    one minute to speak with --

5         **PRESIDING COMMISSIONER BRYSON:**  Certainly.

6    Let's go off record while he does that.

7                         (off the record)

8         **DEPUTY COMMISSIONER KEENAN:**  Back on record.

9    All parties previously identified are present.

10   Moving onto post conviction factors.  Okay.  The

11   last hearing on 9/8/04, we recommended that you get

12   no more 115's, 128 A's, and that you participate in

13   self-help and earn positive chronos.  I see that you

14   have a placement score of 19.  You've had that since

15   3/1/05.  And a total of four 115's, the last one was

16   9/30/93.  A total of three 128 A's, the last one was

17   11/27/95.  So none of those problems since your last

18   hearing.  And looking at the Board Report prepared

19   for this hearing.  Under custody history, it talks

20   about your custody history since your last hearing.

21   It says you transferred to Avenal on 9/9/05.  Prior

22   to the transfer, you worked at the Central Kitchen.

23   You received average to exceptional reports from

24   supervisors.  And while you were at Ironwood,

25   attended numerous group activities.  Those are

26   listed below, and I'll get to those in just a

27   second.  You are presently assigned to the Facility

16

1    Kitchen.  And no reports as yet.  Because you were

2    initially assigned to Conflict Anger and in Life

3    Long -- Life Management, CALM class, but elected to

4    voluntarily to unassigned from this assignment.

5    Briefly assigned to Facility Yard Crew, then moved

6    to the Kitchen.  You're in the Kitchen now?

7         **INMATE BARTHOLOMEW:**  Yes.

8         **DEPUTY COMMISSIONER KEENAN:**  Okay.  Why did you

9    not do the CALM class?  That sounds like a good

10   opportunity.

11        **INMATE BARTHOLOMEW:**  I have Criminon, in which

12   I do self-help with, which is a very, you know,

13   significant, good type of program that was there.

14   And the CALM class to my understanding was not

15   supposed to affect the job I had at that particular

16   time.  I thought it was like a volunteer type of

17   thing, which I've been going to, and do on my spare

18   time after work.

19        **DEPUTY COMMISSIONER KEENAN:**  Was it a full time

20   day?

21        **INMATE BARTHOLOMEW:**  Right.

22        **PRESIDING COMMISSIONER BRYSON:**  Type of a

23   program.

24        **INMATE BARTHOLOMEW:**  That's what the CALM is.

25        **DEPUTY COMMISSIONER KEENAN:**  Okay.  All right.

26   And then he lists under therapy and self-help

27   activities numerous things since your last hearing.

1    Okay.  10/6/04, there is CDC 128 B indicating you

2    began a Victim Awareness Program.  10/13/04,

3    certificate of completion; successful completion of

4    78-week self-help program, and the 12 traditions of

5    Narcotics Anonymous.  78-week program, that's

6    Narcotics Anonymous?

7         **INMATE BARTHOLOMEW:**  Uh-huh.

8         **DEPUTY COMMISSIONER KEENAN:**  Okay.  12/30/04,

9    certificate of completion, completed six-month

10   course of Study And Rehabilitative Techniques

11   Training.  12/30/04, CDC 128 B, noting chrono

12   indicating subject completed a six-month study

13   program in Anger Management, Communication Skills,

14   Victim Awareness, Stress Management, and applied

15   these skills to problem solving and effective

16   decision making.  6/28/05, certificate of

17   completion.  Successful completion of 104-week self-

18   help program including 12-steps of Alcoholics

19   Anonymous.  7/6/05, another 128 B chrono indicating

20   completion of 91 weeks Narcotics Anonymous.  7/8/05,

21   128 B showing laudatory chrono indicating active

22   participant in the A Facilitate Lifer's Group for

23   approximately five years.  7/8/05, 128 B chrono

24   indicating subject completed one-week class designed

25   to empower inmates to communicate effectively.

26   7/19/05, certificate of completion, active

27   participation and one week of effective

18

1    communication training.  And 1/11/06, certificate of

2    completion Crimenon is that how you say it or

3    Criminon?

4          **INMATE BARTHOLOMEW:**  Criminon.

5          **DEPUTY COMMISSIONER KEENAN:**  Learning

6    improvement course.  Okay.  And he also notes you've

7    been disciplinary free this span of time since your

8    last hearing.  Okay.  I also see a chrono in the

9    file.  A laudatory chrono.  July 10, 2006.  This

10   chrono is in the acknowledgment of the excellent

11   work habits of Inmate Bartholomew who is currently

12   assigned at Facility 2 Culinary Recycle Technician.

13   Inmate Bartholomew performs his assigned tasks very

14   well.  He's a dependable worker, and completes his

15   tasks with true diligence.  He works well with both

16   staff and inmates is an asset to Facility 2 Kitchen.

17   That's from S. Herrera.  And then you have another

18   laudatory chrono from A. Isaiah.  Inmate Bartholomew

19   has been a Facilitate 2 Culinary Worker as a recycle

20   since 5/18/06.  Has been exceptionally loyal, a hard

21   worker, has a good attitude toward peers and

22   supervisors.  He's a capable recycler, highly

23   respected, and trustworthy working alongside

24   correctional officers and facility cook.  His

25   ability to perform on his duties has been good, and

26   an excellent job working relationship with staff and

27   peers.  Okay.  I think that's all the updates we

19

1    have.  I saw in one of your reports, you had a TABE.

2    You're TABE school was 12 point 9?

3         **INMATE BARTHOLOMEW:**  Yes.

4         **DEPUTY COMMISSIONER KEENAN:**  Okay.  And we

5    already discussed you graduated high school as well?

6         **INMATE BARTHOLOMEW:**  Yes.

7         **DEPUTY COMMISSIONER KEENAN:**  Okay.  All right.

8    And I notice it's in past reports, you completed,

9    let's see, Anger Control.  You have an Anger Control

10   Certificate, NA certificate back in '03; '02, an AA

11   certificate; and 7/2/02, Breaking Barriers

12   certificate.  You have completed Vocational

13   Landscaping.

14        **INMATE BARTHOLOMEW:**  Yes, sir.

15        **DEPUTY COMMISSIONER KEENAN:**  And you have also

16   completed Vocational Silk-screening.

17        **INMATE BARTHOLOMEW:**  Yes, sir.

18        **DEPUTY COMMISSIONER KEENAN:**  And you worked in

19   the Shoe Repair Department?  Was that vocational

20   or --

21        **INMATE BARTHOLOMEW:**  Yes, sir.  Yes, sir.  It

22   was both.  One was called Shoe Factory; that was

23   work.  And one was called Shoe Repair.  Shoe Repair

24   was vocational, in which I also completed that.

25        **DEPUTY COMMISSIONER KEENAN:**  You did complete

26   it?

27        **INMATE BARTHOLOMEW:**  Yes, sir.

1    **DEPUTY COMMISSIONER KEENAN:** Do you have a copy

2    of your certificate of completion?

3    **INMATE BARTHOLOMEW:** Yes, sir.

4    **DEPUTY COMMISSIONER KEENAN:** So you have three

5    completed vocations. I think that's what I'm

6    hearing?

7    **INMATE BARTHOLOMEW:** Yes, sir.

8    **PRESIDING COMMISSIONER BRYSON:** Can you go over

9    it again one more time of the three vocations.

10   **DEPUTY COMMISSIONER KEENAN:** He has Vocational

11   Landscaping, Vocational Silk-screen, and he's

12   telling me now he has Vocational Shoe Repair as

13   well.

14   **PRESIDING COMMISSIONER BRYSON:** Okay.

15   **DEPUTY COMMISSIONER KEENAN:** Has successfully

16   completed Vocational Shoe Repair in '99. Thanks.

17   Okay. Very good.

18   **INMATE BARTHOLOMEW:** Thank you.

19   **DEPUTY COMMISSIONER KEENAN:** All right. I

20   don't think there's anything else. Yeah, go ahead.

21   **INMATE BARTHOLOMEW:** There was also another

22   laudatory chrono that I've got.

23   **DEPUTY COMMISSIONER KEENAN:** Do you know the

24   date on it?

25   **INMATE BARTHOLOMEW:** Yes, sir. Which was from

26   G. Fuente or Correctional Officer Fuente.

27   **DEPUTY COMMISSIONER KEENAN:** What date?

21

1    **INMATE BARTHOLOMEW:**  10/12/06.

2    **DEPUTY COMMISSIONER KEENAN:**  Yeah.  I don't see

3    it in the file.  Maybe it's in here, but I just

4    didn't see it.  Okay.  All right.  Well, I'll look

5    at yours then.  10/12/06, currently assigned as

6    Housing Unit Floor Officer, and I've had the

7    opportunity to observe Inmate Bartholomew --

8    Bartholomew function on a daily basis.  He interacts

9    well, and is respective towards staff and other

10   inmates he works with and lives with.  Bartholomew

11   maintains cleanliness of his living area and a

12   positive attitude.  He lends assistance when called

13   upon to do so.  His hard work is appreciated.  Okay.

14   It's nice to see that you have everything organized

15   in a folder there.  I often see inmates who got a

16   file this thick, and they will tell me they

17   completed something, and I go do you have a

18   certificate, and they'll point to the file, and

19   they'll say it's in there somewhere.  So it's nice

20   to see occasional organized person.  All right.  Am

21   I missing anything or does that pretty much cover

22   the positives and the negatives about your

23   institutional adjustment.

24   **INMATE BARTHOLOMEW:**  Yes.  That pretty much

25   covers it.

26   **DEPUTY COMMISSIONER KEENAN:**  Okay.  Oh, that's

27   outrageous.

22

1      PRESIDING COMMISSIONER BRYSON:  Yes, these are

2  yours; is that correct?

3      INMATE BARTHOLOMEW:  Yes, ma'am.  Art.

4      PRESIDING COMMISSIONER BRYSON:  Quite an

5  artist.

6      DEPUTY COMMISSIONER KEENAN:  You've done these?

7      INMATE BARTHOLOMEW:  Yes, sir.

8      DEPUTY COMMISSIONER KEENAN:  You painted these?

9  What do you paint these with?

10      INMATE BARTHOLOMEW:  The water paint, color

11  paint, and colored pencil, also pastel, and some

12  charcoal.

13      DEPUTY COMMISSIONER KEENAN:  Where did you

14  learn how to do this?

15      INMATE BARTHOLOMEW:  I've been doing that since

16  a child.

17      PRESIDING COMMISSIONER BRYSON:  Very

18  impressive.

19      DEPUTY COMMISSIONER KEENAN:  Who's that?

20      INMATE BARTHOLOMEW:  Just some person.

21      DEPUTY COMMISSIONER KEENAN:  It looks like a

22  musician, popular musician.

23      INMATE BARTHOLOMEW:  Miles Davis?

24      DEPUTY COMMISSIONER KEENAN:  No, no.

25      ATTORNEY HALL:  It looks like Tracy Chapman.

26      DEPUTY COMMISSIONER KEENAN:  That's exactly

27  what I was thinking.  Okay.

23

1    **INMATE BARTHOLOMEW:** I have larger ones, but I
2    sent them home and stuff like that.
3    **DEPUTY COMMISSIONER KEENAN:** That's very good.
4    Do you plan to do anything with that?
5    **INMATE BARTHOLOMEW:** Yeah, I wanted to pursue
6    it. I was told that artists don't make too much
7    money, so I had to pursue a different career.
8    **DEPUTY COMMISSIONER KEENAN:** Yeah, that's not
9    necessarily -- bet all your money, you know. Okay.
10   Moving forward to the psychological evaluation then.
11   We have one -- we have one. And it's from Dennis
12   Payne, P-A-Y-N-E, M.D., psychiatrist. And in
13   assessing you, he covers various topics, among them
14   would be, I won't go into all of it. Substance
15   abuse history, he notes that. He says you began
16   drinking around ages of 17, progressing from beer to
17   wine to hard liquor. States he would drink several
18   times a week. Starting using marijuana around 16,
19   and used mostly on weekends. That was his drug of
20   choice. Also, he used cocaine on occasion.
21   Currently the inmate is involved in NA, AA. Under
22   psychiatric and medical histories, says there's no
23   past history of psychiatric treatment, no history of
24   suicide attempts, and has not received any
25   psychiatric treatment within CDC. Does not have any
26   chronic medical problems. Has never undergone any
27   major surgery. He has no history of seizures, and

24

1    he has never suffered any head injury leading to

2    loss of consciousness.  He is not on any medications

3    at the present time.  Talks about your parole plans,

4    your current mental status and treatment needs.  He

5    says under current mental status, mood is normal

6    affect is appropriate, speech is articulate, and

7    he's calm, makes good eye contact, shows no evidence

8    of thought disorder.  He does not exhibit any

9    auditory or visual hallucinations.  No suicidal or

10   homicidal thoughts are present.  He is oriented of

11   time, person, and place.  Concentration is good.

12   Insight and judgment are good.  Diagnosis:  Axis I,

13   history of marijuana, alcohol, cocaine abuse in

14   remission.  Axis II, no diagnosis.  Global

15   Assessment of Functioning, 85.  Inmate does not

16   exhibit any psychiatric disorder.  Goes over the

17   life crime.  And he notes in part in regard to

18   inmate's previous arrest history appears the drug

19   abuse, impulsive decisions, and poor judgments were

20   related to erratic behavior, as well as possibly

21   being under the stress of the loss of his

22   grandmother.  Under assessment of dangerousness, the

23   psychiatrist says, "Within a controlled setting, the

24   inmate's propensity for violence is considered to be

25   less than that of the level one inmate, and would

26   not be significantly greater than that of the

27   average citizen in society."  Past risk factors of

1   drug abuse, impulsive behavior, and poor judgment

2   appear to be resolved.  And under clinical

3   observations, comments, and recommendations, doctor

4   notes that all though inmate has had four CDC number

5   115's since his incarceration, he has been

6   disciplinary free for the past five and one-half

7   years.  He's been programming well, educating

8   himself, and shown responsible behavior.  He appears

9   intelligent and resourceful enough to find

10  employment in the future, and he shows respect for

11  the rights of others in his actions and in his

12  thinking.  He does not exhibit any antisocial type

13  thinking, and shows a desire to be a contributing

14  member of society.  The inmate should continue with

15  his current programming.  Future parole plans should

16  include abstinence from alcohol and drugs as well as

17  attendance to AA and NA.  He should also develop

18  additional parole plans in regard to employment and

19  living arrangements.  Is there anything you want to

20  say about that?

21      **INMATE BARTHOLOMEW:**  No, sir.

22      **DEPUTY COMMISSIONER KEENAN:**  Okay.  All right

23  thanks.  Give it back to the Chair, please.

24      **PRESIDING COMMISSIONER BRYSON:**  Okay.  Thank

25  you.  Standby, looking for something in particular.

26  Today I just want to note for the record, this

27  inmate has taken responsibility for the crime.

1  However, he is exercising his right not to speak

2  about the crime.  However, this Panel does note also

3  in the -- it's actually psychiatrist report of

4  Dennis Payne, M.D., it does state under section 13

5  reviewing the life crime, this would be on page -- I

6  don't know what page it is.  Just one moment.

7         **DEPUTY COMMISSIONER KEENAN:**  Four,

8  Commissioner.

9         **PRESIDING COMMISSIONER BRYSON:**  Is it four.

10  Thank you.  Actually in that section, it's the

11  second from the last paragraph.  He says, and this

12  is in reference to the life crime, "Next day he

13  heard that the victim had been shot, and he

14  subsequently arrested a few days later.  The inmate

15  states that he was not at the crime scene, and was

16  not involved in it.  He does however express

17  sympathy for the victim."  And I note that this

18  psych report was done in on April 12th, 2004.  And

19  of course the Board Report that I'm referring to

20  where Bartholomew says, under his version, "I

21  stipulate as to what is in the court transcript."

22  And in fact does by his attorneys representation

23  here today take responsibility for the crime.  That

24  is actually at odds with what he told the

25  psychologist, this psychiatrist, excuse me, it is a

26  psychiatrist back in 2004.  So it would appear that

27  a reasonable person would conclude that in fact this

1    inmate has just recently taken responsibility for

2    this crime.  I thought that was important to note

3    here today.  And then going onto your plans, sir.

4    And we have -- I have looked at the material you

5    handed us immediately prior to this hearing.  I have

6    to say that your art and prints is absolutely

7    stunning.  It's just breathtaking.  It really is.

8    And I don't know if this is an evolution from back

9    to front or -- do you want to talk about it?

10    **INMATE BARTHOLOMEW:**  From front to back.

11    **PRESIDING COMMISSIONER BRYSON:**  From front to

12    back.  Actually, I like the girly ones very much.

13    Yes, I do.  They are very -- they are just stunning,

14    both in the color and the lines themselves.  They

15    are stunning.

16    **INMATE BARTHOLOMEW:**  They are the nurtures of

17    humanity.

18    **PRESIDING COMMISSIONER BRYSON:**  I see.  That's

19    your -- oh, wow.  I hope you will continue to evolve

20    this.  This is -- this is truly a nice work because

21    you may not be able to make money, hopefully some

22    day, you will actually be about to do this full

23    time, which I'm sure is every artist's dream to be

24    able to do.  This is a very impressive portfolio of

25    work right here.  I am sure there are more that have

26    already been  (inaudible).  Then we also have a

27    letter from you.  This is dated March 14th, 2006.

28

1    Now, perhaps you could address this a little bit.

2    This letter was written, it appears to be a sample

3    of your outreach letter or in response to another

4    letter you got.  Could you explain this?

5         **INMATE BARTHOLOMEW:**  Yes, ma'am.  To a

6    potential job employer out there.  And there was

7    responding back and forth with me and saying that,

8    yes, they would help.  It would be of service to me

9    to help me find work or employ me as soon as I was

10   ready.  But I had to be ready in order for to

11   receive their services.

12        **PRESIDING COMMISSIONER BRYSON:**  I understand.

13        **INMATE BARTHOLOMEW:**  And that's not the only

14   letter.  It was, you know, a few employers that I

15   tried to reach.

16        **PRESIDING COMMISSIONER BRYSON:**  I see.

17        **INMATE BARTHOLOMEW:**  That I tried to reach out

18   to.

19        **PRESIDING COMMISSIONER BRYSON:**  Good.

20        **INMATE BARTHOLOMEW:**  Just to actually try to

21   improve any chances of employment to make a

22   livelihood for myself.

23        **PRESIDING COMMISSIONER BRYSON:**  Did you send

24   out a resume accompanying that letter or anything of

25   that sort?

26        **INMATE BARTHOLOMEW:**  Not what you would call

27   the, I guess, conditional resume, but I did list

29

1    some things in which I, myself, was capable of

2    doing.  The trades that I have, what I was here for,

3    and what I actually intended to do if I got the job.

4         PRESIDING COMMISSIONER BRYSON:  That's good.

5    Okay.  And then we also have from you some material

6    showing that you have actually reached out to

7    various community services groups, and one in

8    particular, the Community Connection, which wrote

9    back on June 7, 2006.  This is Sheryl Albrecht, A-L-

10   B-R-E-C-H-T, talking about the program and sending

11   an admission statement for this program, basically

12   help with substance abuse and help people in

13   transition get back into society.  And inner face

14   with parole in doing so.  So this is, and this is

15   specifically for the San Diego area.  And I assume

16   this is where you'd like to relocate?

17        INMATE BARTHOLOMEW:  Yes, ma'am.

18        PRESIDING COMMISSIONER BRYSON:  Or to locate

19   actually.  Do you still plan and hope to live with

20   Sharon Gamble (phonetic), your fiancé?

21        INMATE BARTHOLOMEW:  Yes, ma'am.

22        PRESIDING COMMISSIONER BRYSON:  Do you have

23   anything from her?

24        INMATE BARTHOLOMEW:  I have letters of the

25   support.

26        PRESIDING COMMISSIONER BRYSON:  All right.  The

27   most recent one would be?

30

1       **INMATE BARTHOLOMEW:**  Would be here.

2       **PRESIDING COMMISSIONER BRYSON:**  All right.  I

3    appreciate seeing that.  Let me ask you because I

4    failed to ask earlier, did you get an opportunity to

5    do an Olson review, and did you do one?

6       **INMATE BARTHOLOMEW:**  Yes, ma'am, I did.

7       **PRESIDING COMMISSIONER BRYSON:**  I don't know if

8    a copy of this material is in your file.  That's the

9    time that you can get copies made and put into your

10   file.  We're not allowed to put anything in your

11   Central file, and it's a huge burden.  We understand

12   these files get very large, but still, it's an

13   important thing for you to do, and it's good for you

14   to keep the originals, and get copies put into your

15   file.  The Olson review is all about you, and every

16   time you get a chance, it's a good idea to do them.

17   And I just wanted to make that recommendation

18   because we understand that some prisoners have not

19   been really given in any information about this.

20   This is a letter from Sharon Gamble of February

21   20th, 2006.  And let's see, is this, this is in

22   here, right.  So I'm just saying, I'm looking for a

23   signature is all.  Did she sign this?

24      **INMATE BARTHOLOMEW:**  I believe she sent the

25   original to the correctional counselor.

26      **PRESIDING COMMISSIONER BRYSON:**  All right.  And

27   this is a copy?

31

1        **INMATE BARTHOLOMEW:**  And I believe that's a

2    copy.

3        **DEPUTY COMMISSIONER KEENAN:**  You can take it --

4        **PRESIDING COMMISSIONER BRYSON:**  I can see that

5    it's not signed.  The copy is not signed.  The

6    concern is this.  The concern is we want to belief

7    every prisoner that comes in here.  Obviously we

8    can't.  So when we get a letter that's not signed,

9    we have to ask all right, did someone type this up

10   and represent it -- misrepresent it to either

11   person?  I'm going to just reference this letter and

12   just say that in fact this letter exists.  It is

13   represented to be from Sharon Gamble in San Diego.

14   And she writes that she feels that you have changed.

15   You put forth many efforts to improve yourself, and

16   she talks about, you're a very important, close,

17   dear person, best love fiancé.  And she believes you

18   will be a law-abiding citizen -- I will do what I

19   can to read from the --

20       **ATTORNEY HALL:**  I believe a copy of that is in

21   the copy.

22       **PRESIDING COMMISSIONER BRYSON:**  I don't have

23   any letters in my packet.

24       **ATTORNEY HALL:**  Oh.

25       **PRESIDING COMMISSIONER BRYSON:**  I don't know

26   whether they don't get these done on time.

27       **ATTORNEY HALL:**  Yes.

32

1       **PRESIDING COMMISSIONER BRYSON:** Would you like

2   to exert, counsel?

3       **ATTORNEY HALL:** Sure.  That's -- anything

4   that's in there, if you would exert, that would give

5   us.  Okay.  Troy and I plan to be married soon, and

6   upon his release, I will providing him with a place

7   to live, which is ███ Wabash, W-A-B-A-S-H, Avenue,

8   apartment number 2, San Diego, California, 92104,

9   and there's a telephone number.  I will also be

10  providing him with someone to talk to, a partner to

11  pray with, a person to encourage and spend time with

12  him, transportation, and anything I have and can

13  contribute to him.

14      **PRESIDING COMMISSIONER BRYSON:** Okay.  Are

15  there other letters in there that you have?

16      **ATTORNEY HALL:** Yes.  There's from Paul and

17  Angela Bartholomew.  We are writing on behalf of

18  Troy Bartholomew who is currently incarcerated.

19  Troy is our brother, uncle, friend, and loved one.

20  And we miss him dearly.  And need him back in our

21  family.  Troy has a job waiting for him here.  We

22  are a small independent hauling and moving business,

23  and there is definitely a job here waiting for him.

24  We are church going people, and pray for his safety

25  every night in our prayers.  And it is signed, Paul

26  Bartholomew and Angela Bartholomew.

27      **PRESIDING COMMISSIONER BRYSON:** Okay.  Is that

33

1    all?

2        **ATTORNEY HALL:**  And there are photographs

3    accompanying.  There's another one.  This one from

4    Keith Reeves Sr., dated March 25, 2006, Mr. Reeves

5    says he's a lifelong friend of Mr. Bartholomew.

6    Today he has come before you to be judged, and if he

7    -- to be judged if he is able to be reintroduced

8    back into society.  I know this is not an easy task

9    for anyone.  And me as being a father and husband

10    and a tax-paying citizen would hope that your task

11    would be fair and impartial.  I would just like to

12    briefly address what I know about Mr. Bartholomew as

13    I've stated in previous letters.   (inaudible)

14    embraced by his grandmother who also was like a

15    mother to my own mother.  Since Mr. Bartholomew lost

16    his own parents at an early age.  And it goes on.

17    He has a very special gift in art that he has

18    steadily improved since we were teenagers.  We were

19    typical teenagers from middle class neighborhood

20    San Diego, California, with no problems going up,

21    and I think that is a testament to our upbringing

22    and our steady determination to succeed in life.

23    After we graduated in 1983, I joined the navy, and

24    Troy went straight to work.  He stayed employed at a

25    neighborhood grocery store on 32nd Street, and also

26    he worked for an upscale steak house, Rain Waters

27    downtown San Diego, et cetera.  We both remain in

34

1    San Diego throughout the years becoming parents and

2    trying different careers, and have little obstacles.

3    I saw Mr. Bartholomew before the crime occurred.  He

4    was clean and sober, and was converting to Islam.

5    And was happy, and he was smiling, and gave me a

6    ride to my job because I used public transportation.

7    And we just talked, and soon after that, I had heard

8    what had happened.  Essentially, I'm just giving a

9    little more information to make the vote.  Here are

10    a couple of drawings Troy made, and these are

11    enclosed.

12    **PRESIDING COMMISSIONER BRYSON:**  Okay.  Thank

13    you.  Of course, photocopying them basically it's a

14    disaster usually.

15    **ATTORNEY HALL:**  And finally, he already has

16    skills valuable for employment if he is granted

17    parole.  And he can stay in my home if needed until

18    becoming stable.  I am willing to help try top land

19    him employment.  I've talked to some employers

20    already.  Thanks for your time.  Keith Reeves Sr.

21    **PRESIDING COMMISSIONER BRYSON:**  All right.

22    Thank you.  I also note that you've reached out to

23    the employment development department in the State

24    of California and received a response from Jerica

25    Daleo, D-A-L-E-O, on July 7th, 2006, and saying that

26    Cal Jobs is the website, and this is the South Metro

27    Career Center where the job opportunities exist.

35

1    And asking about your interest in jobs.  What jobs

2    you would be looking for.  And then a follow up

3    response.  This is from the same agency; is that

4    correct?

5        **INMATE BARTHOLOMEW:**  Yes, ma'am.

6        **PRESIDING COMMISSIONER BRYSON:**  On 22nd of

7    August 2006, again from Jerica Daleo, and talks

8    about the occupation you mentioned.  The ones that

9    may pay you more money would be clerk or building

10   maintenance.  There are not too many jobs in Shoe

11   Repair, Silk-screening, Landscaping, and Boats.  We

12   do get orders from general office clerks, painters,

13   buildings, maintenance, and sales.  And also speaks

14   about the artwork and suggest perhaps graphic arts

15   as the way to get into doing art full time.  Have

16   you thought about that?

17       **INMATE BARTHOLOMEW:**  Yes, I have.  Yes, I have.

18       **PRESIDING COMMISSIONER BRYSON:**  Okay.

19   Excellent.  All right.

20       **ATTORNEY HALL:**  There's also a letter from -- I

21   don't know if you referenced this already Carolyn

22   Baker, did you cover that one?

23       **PRESIDING COMMISSIONER BRYSON:**  No, I did not.

24   Go ahead.

25       **ATTORNEY HALL:**  This is a handwritten letter

26   from Carolyn Baker who says Troy has proven to

27   better his life.  He is taking courses to better his

1   education during his 14 years in prison.  He has

2   worked hard, and  (inaudible) to show him

3   improvement.  Troy has been my friend for more than

4   five years.  I have gotten to know and care about

5   him.  He has paid society back with 14 years of his

6   life.  He needs to be released from prison.  He

7   needs to be released to start looking outside

8   prison.  He can and will contribute to other people

9   out of prison.  He has a gift to improve his life

10  and others.  He can build, structure, guide, live a

11  greater quality of life outside prison.  Given the

12  opportunity, Troy needs to be free.  Keeping him in

13  any longer behind bars will hurt him, me, his

14  family, and many other loved ones.   (inaudible) his

15  dad -- I guess his debt has been paid, et cetera.

16  It's very supportive.

17       **PRESIDING COMMISSIONER BRYSON:**  Good.  Thank

18  you.

19       **ATTORNEY HALL:**  And it's signed Carolyn Baker.

20       **PRESIDING COMMISSIONER BRYSON:**  All right.

21  Thank you.  All right.  We have sent out 3042

22  notices.  Those agencies go to agencies having a

23  direct interest in your case.  One moment before I

24  proceed to that, I just remembered, on the college

25  classes, are you still taking college classes?

26       **INMATE BARTHOLOMEW:**  No, ma'am, not here.  I

27  just recently, well, one year, came from Ironwood to

1    here.  And I'm not sure if this institution offers

2    college courses.

3        **PRESIDING COMMISSIONER BRYSON:**  Okay.  And what

4    is your interest in the college?  What kind of

5    courses are you interested in?  What would be your

6    goals that way?

7        **INMATE BARTHOLOMEW:**  To get a degree.

8        **PRESIDING COMMISSIONER BRYSON:**  Okay.  In what?

9    Do you have any idea?

10       **INMATE BARTHOLOMEW:**  Just basic or generally

11   education.  You know, just to improve any education,

12   my learning ability.

13       **PRESIDING COMMISSIONER BRYSON:**  Okay.  Great.

14   Thank you.  As to 3042 notices, San Diego district

15   attorney's office did plan to be on video conference

16   with us today.  However, our late proceedings,

17   precluded their participating this afternoon.  And

18   so we'll go to any questions, Commissioner Keenan,

19   you have of the inmate.

20       **DEPUTY COMMISSIONER KEENAN:**  Nothing.  Thank

21   you.

22       **PRESIDING COMMISSIONER BRYSON:**  All right.

23   And, so counsel, do you have questions of the

24   inmate?

25       **ATTORNEY HALL:**  No questions.

26       **PRESIDING COMMISSIONER BRYSON:**  All right.

27   Then I'd like to invite you to make a closing

1   statement.

2       **ATTORNEY HALL**: thank you.  Mr. Bartholomew has

3   accepted the record of the conviction of this

4   offense and has taken responsibility for the

5   commitment offense.   What he has focused on since

6   his incarceration has been to make himself a better

7   person.  He's a young person who at the time of the

8   conviction was 26 years old, and most people would

9   say that was not a very young age to have been

10  convicted of this offense.   But what Mr. Bartholomew

11  has done or had down up to that point was really

12  with the assistance of his grandmother after his

13  mother was killed, in fact was able to have a fairly

14  stable social life.  Going to school, graduating

15  high school, working, starting a family, as I think

16  Mr. Reeves indicated in his letter.  So basically,

17  we know that he was able to educate himself and we

18  know that he did have some problems prior to the

19  commitment offense, some criminal record, but

20  insignificantly, that record did not include any --

21  it was minimal history of any violence.   I think

22  that there was just one offense where there was one

23  act of violence of aggression.   And what he has done

24  has maintained a disciplinary free tenure since

25  September of 1998, and again focusing on educating

26  himself, using his time well.  We look at the self-

27  help that he's participated in including AA and NA,

1      Victim's Awareness, Anger Management, Rehabilitative
2      Therapeutic Techniques, Communicating, Communication
3      Skills, Stress Management.  In essence, he has
4      embarked in a program of self-help designed to help
5      his maturation and growth.  Now he's 41 years old,
6      and clearly has found a calling and passing his time
7      doing his artwork, self-help, and really preparing
8      himself with the vocation, which with he could find
9      gainful employment.  He has gotten three vocations,
10     so he's certainly equipped to go out into the
11     community and earn a living legally.  With respect
12     to his parole plans, he has alternative residences,
13     and he has demonstrated his initiative by writing to
14     prospective employers, so we know he has employment
15     offers as well as other prospective employers who
16     are waiting for him to come out who are for him to
17     get employment with those companies.  So generally,
18     we have a person who is certainly on -- is making
19     himself suitable for parole.  In terms of the
20     psychological assessment, we know that Dr. Payne
21     indicated that within a controlled setting, Mr.
22     Bartholomew is considered to be less -- lower than
23     the level one inmate in terms of risk assessment and
24     would not be any risk assessment would not be
25     significantly greater than the average citizen in
26     the community.  I think that Dr. Payne has really
27     pointed out that in fact Mr. Bartholomew continues

1    to mature, continues to understand the kind of

2    lifestyle he has prior to coming to prison, and he

3    certainly made a change for the better, and will

4    continue to do so.  And we would ask that this Panel

5    find him suitable today.  Thank you

6        **PRESIDING COMMISSIONER BRYSON:**  Thank you.  And

7    now, sir, I would like to give you the opportunity

8    to address this Panel regarding your suitable for

9    parole.

10        **INMATE BARTHOLOMEW:**  I would first like to say

11    that I'm sorrowful for the hurting and the pain of

12    which Mr. Seedat and his family is going through.

13    And my spirituality, my spiritual teachings teaches

14    that, you know, we should not take a life for which

15    God holds as sacred, and every life, every person

16    that has life running through them is sacred.  So

17    that is something in which I'm afraid of and

18    sorrowful for.  I'm also sorry for the pain and the

19    hurt of which I've caused, as well as the

20    disappointments to other people before this.  And

21    since that time of this offense, I've taken the

22    responsibility to try to correct myself, and I've

23    been constant in my rehabilitation and my efforts to

24    improve myself to change my life, to change the

25    focus, to change the thinking in which led to my

26    negative behavior, and I believe that that's correct

27    now.  And I hope for mercy, I hope for forgiveness,

41

1    and also for the capacity to understand what freedom

2    entails.  I ask, you know, not to allow my life to

3    be wasted in here what I've learned from my

4    mistakes.  In life, we make mistakes.  We make

5    faulty decisions.  It is not, you know, life itself

6    where mistakes in which we with make to be learned

7    from.  And I know that I'm not a criminal.  I'm not

8    a monster.  I'd like for the Board to actually look

9    at me as a human being who actually made a mistake

10   but have come to recognize the mistakes and faults,

11   which I've made in life, and I'm ready to be

12   reinstated back into the society.  I know good and

13   well that I would not let this Panel down.  I will

14   not let the society down and my community down.  I

15   wouldn't let me family down, and I wouldn't let

16   myself down, you know, if reinstated back into

17   society where I'm ready to be parole.  Thank you.

18       **PRESIDING COMMISSIONER BRYSON:**  Thank you, sir.

19   We are going to recess for deliberations.  The time

20   is now 14:53.

21                    **R E C E S S**

22                    --o0o--

23

24

25

26

27

42

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3      **DEPUTY COMMISSIONER KEENAN:**  Back on record.  All

4      parties previously identified are present.

5          **PRESIDING COMMISSIONER BRYSON:**  I believe we

6      returned everything -- I believe we returned everything,

7      basically, so please look through it.  But I think all

8      the materials have been returned to you.  The Panel

9      reviewed -- oh, we reconvened for the decision, and the

10     time is now 15:23 in the matter of Troy Bartholomew.

11     Sir, the Panel reviewed all the information received from

12     the public and relied on the following circumstances in

13     concluding that you are not yet suitable for parole and

14     would pose an unreasonable risk of danger to society or a

15     threat to public safety if released from prison.  This

16     offense was carried out in an especially cruel and

17     callous manner in that the victim, Dr. Hassen Seedat was

18     particularly vulnerable as he was giving you a ride in

19     his van.  At some point during the drive, you asked him

20     to give you some money, and he advised you that he did

21     not have money do give.  This offense was carried out in

22     a dispassionate and calculated manner in that after Dr.

23     Seedat stopped for fuel and returned to the vehicle, you

24     put a handgun to his face making pow, pow, pow sounds,

25     then claiming it was a toy gun.  Becoming afraid, Dr.

26     Seedat asked you where he could drop you off.  You loaded

27     **TROY BARTHOLOMEW H-18717 DECISION PAGE 1   11/14/06**

43

1   the gun with bullets and then began shooting at Seedat's

2   face hitting him four times, which it is a miracle that

3   he lived.  You do have a prior history of assaultive

4   behavior, prior criminality, and escalating pattern of

5   criminal conduct, and you were in fact on probation at

6   the time of the commitment offense.  As to your

7   institutional behavior, you are presently working in the

8   kitchen and you've been getting average to exceptional

9   work reports.  You have had a number of different jobs,

10  and you have to your great credit performed and completed

11  three vocations that of Shoe Repair, Silk-screen, and

12  Landscaping.  And you also have been doing other work

13  that would give you marketable skills.  You have also

14  taken college classes.  You came in as a high school

15  graduate.  I should note you've received laudatory

16  chronos, and you have also participated from very good,

17  solid self-help programming, which has been read

18  extensively into the record.  You have shown positive

19  change in misconduct that you initially had when you

20  first came.  You've shown a positive change in the last

21  basically eight years.  Your last 115 of the four in your

22  record, occurred in 1998 for unlawful assembly.  So you

23  have started to display positive behavior in prison.  As

24  to the psychological report dated April 12, 2004, by Dr.

25  Dennis Payne, basically assigns you a fairly high global

26  assessment of functioning of 85 and also assesses you at

27  **TROY BARTHOLOMEW H-18717 DECISION PAGE 2   11/14/06**

44

1    a lower than level one inmate risk for violence.  As to

2    your parole plans, you have presented the Board today

3    documented alternatives for residence and also a

4    prospective employment opportunities, and you do have

5    marketable skills.  As to penal code 3042 responses, we

6    do not have responses from San Diego District Attorney.

7    In a separate decision, the hearing Panel finds it is not

8    reasonable to expect that parole would be granted at a

9    hearing during the following two years.  Specific reasons

10   for this finding are as follows:  This offense was

11   carried out in an especially cruel and callous manner in

12   that the victim, Dr. Hassen Seedat was particularly

13   vulnerable as he was giving you a ride in his van.  At

14   some point during the drive, you asked Dr. Seedat to give

15   you some money, and he advised that he did not have money

16   do give.  This offense was carried out in a dispassionate

17   and calculated manner in that after Dr. Seedat stopped

18   for fuel and returned to the vehicle, you put a handgun

19   to his face making pow, pow, pow sounds, then claiming it

20   was a toy gun.  Becoming afraid, Dr. Seedat asked you

21   where he could drop you off.  You loaded the gun with

22   bullets and then began shooting at Seedat's face hitting

23   him four times.  This offense was carried out in a manner

24   demonstrating exceptionally callous disregard for human

25   suffering.  First of all, the fear that Dr. Seedat must

26   have experienced when you loaded the gun is pretty

27   **TROY BARTHOLOMEW H-18717 DECISION PAGE 3  11/14/06**

45

1  unimaginable.  After he fell to the ground, you fled the

2  scene.  Per hospital records, Dr. Seedat was first shot

3  in the upper arm, second in the his shoulder, and that

4  lodged in the base of his neck.  The third shot entered

5  his jaw, and it went across his throat, and the fourth

6  scraped the back of his head.  This was I believe what

7  they -- which was with a pistol, a small caliber pistol.

8  The motive for this crime is moreover inexplicable.  This

9  is the most troubling part to the Panel.  As you

10  presented her today, and you presented very well.  You

11  presented as a mature adult.  You obviously have talents

12  and have done impressive programming here in the

13  institution and other institutions.  And you have

14  embarked on a program of disciplinary behavior.  It

15  really appears that you have gotten it.  It makes the

16  crime all the more inexplicable that it even happened.

17  In 2004, you claimed to the psychologist that you didn't

18  commit this crime, and in fact, it appears only recently

19  and including today that you're taking responsibility for

20  this offense.  The Panel, therefore, has to believe that

21  your insight and therefore your understanding of the

22  nature and magnitude of this crime is as of yet

23  undetermined, and you remained unpredictable and a threat

24  to public safety.  In denying you parole for two years

25  ago, we are placing you in a 2008 calendar for your next

26  subsequent hearing.  The Board recommends no more 115's,

27  **TROY BARTHOLOMEW H-18717 DECISION PAGE 4   11/14/06**

46

1  or 128 A's.  That you get self-help, meaning that you

2  continue on your programming, which is including the AA,

3  NA, which you have been participating in on a very

4  regular basis; continue advancing your trade, since

5  skills are obviously perishable, but you are working

6  hard; that you earn positive chronos; that you advance

7  your education as it's available to you, recognizing that

8  it may not always be available within the institution.

9  We are ordering a new psychological evaluation per BPT

10  form 1000 A for your next hearing.  And we also encourage

11  you to continue your artwork, and I wish I good luck.

12  And do you have anything to add, Commissioner Keenan?

13      **DEPUTY COMMISSIONER KEENAN:**  Did you want me to go

14  over any of the list of what he has done since his last

15  hearing, any positive --

16      **PRESIDING COMMISSIONER BRYSON:**  Well, that was --

17  that was read into the record, so that's why I eluded to

18  it in the decision.  But I don't feel it's necessary to

19  completely re-elude it into the record at this time.

20      **DEPUTY COMMISSIONER KEENAN:**  Oh, okay.  I wish him

21  good luck then.

22      **INMATE BARTHOLOMEW:**  Well. I asked the last Panel

23  what did I need to be found parole suitable?  And they

24  gave me the same things that you just read to me, you

25  know, the self-help, stay disciplinary free, and upgrade.

26  And I did that, so I'm asking what is it that I need to

27  **TROY BARTHOLOMEW H-18717 DECISION PAGE 5  11/14/06**

47

1   be found parole suitable.

2       **PRESIDING COMMISSIONER BRYSON:**  If you continue the

3   programming -- right now, your unsuitability just doesn't

4   outweigh the -- it outweighs rather the suitability

5   factors that you have at this time.  You have suitability

6   factors, but you also have -- you have factors of

7   unsuitability that we had to consider.  And those were

8   your disciplinary.  The fact that you just recently took

9   responsibility for this crime.  You've been denying this

10   crime for a long time, and it's on record.  And that's

11   all we are to go by, is that.  But today, you've taken

12   responsibility for it, as recently as 2004, you did not.

13   So that's what we have on our record, and that's what we

14   have to deal with, sir.  And that's the basis.  But I

15   would encourage you to continue because you do present

16   well, and you would be a good candidate at some point.

17       **INMATE BARTHOLOMEW:**  And you just don't know how

18   long?

19       **PRESIDING COMMISSIONER BRYSON:**  That's correct.

20   That's a discretionary item.  And that depends in large

21   part on you.

22       **INMATE BARTHOLOMEW:**  Thank you.

23       **PRESIDING COMMISSIONER BRYSON:**  Don't discouraged.

24       **INMATE BARTHOLOMEW:**  Well, after years and years of

25   coming back and forth, you know, the people that are in

26   your life can't be expected to be continuously be in your

27   **TROY BARTHOLOMEW H-18717 DECISION PAGE 6  11/14/06**

48

1    life because time moves on, and people move on.  And the

2    next time I come back, and you ask me what jobs do I

3    have, I might not have any or a home or a place to stay.

4    I might not have any because the longer that I'm in here,

5    the less likely people are going to actually believe that

6    I'm doing good.

7        PRESIDING COMMISSIONER BRYSON:  I understand, sir.

8        INMATE BARTHOLOMEW:  Thank you.

9        PRESIDING COMMISSIONER BRYSON:  -- 15:33.

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED TWO YEARS**

24   **THIS DECISION WILL BE FINAL ON:**_____MAR 1 4 2007_____

25   ~~YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT~~

26   **DATE, THE DECISION IS MODIFIED.**

27   **TROY BARTHOLOMEW H-18717 DECISION PAGE 7  11/14/06**

49

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Priscilla Baker, a duly designated transcriber, VINE, MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 48, and which recording was duly recorded at AVENAL STATE PRISON, at AVENAL, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of TROY BARTHOLOMEW, CDC No. H-18717, on NOVEMBER 14, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated January 10, 2007, at Sacramento County, California.

_____

Priscilla Baker
Transcriber
**VINE, MCKINNON & HALL**

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
ABSTRACT OF JUDGMENT
FOR COMMITMENT TO STATE PRISON

THE PEOPLE OF THE STATE OF CALIFORNIA
                                    PLAINTIFF

VS

TROY ANTHONY BARTHOLOMEW
                                    DEFENDANT

DATE __DECEMBER 26, 1991__

CASE NUMBER: __CR124142__

PRESENT
HON._____ MICHAEL D. WELLINGTON
                              JUDGE OF THE SUPERIOR COURT

EDWIN L. MILLER, Jr., District Attorney

By_____ BROCK ARSTILL _____DEPUTY

JEFFREY THOMA
                    COUNSEL FOR DEFENDANT

DOUG PECK
                    CLERK

ELAYNE STUDENBERG, #7975
                    REPORTER

PROBATION HAVING BEEN HERETOFORE GRANTED AND SAID PROBATION HAVING BEEN REVOKED ON _____

[X] APPLICATION FOR PROBATION IS DENIED.    THE DEFENDANT (~~IS DULY ARRAIGNED~~) (WAIVES FORMAL ARRAIGNMENT).

Count No. __ONE-43__ _____. WHEREAS THE SAID DEFENDANT ON HIS PLEA
of_____ __NOT GUILTY__ _____having
                    (GUILTY, NOT GUILTY, FORMER CONVICTION OR ACQUITTAL, ONCE IN JEOPARDY, NOT GUILTY BY REASON OF INSANITY)

been convicted by __JURY__ of __ATTEMPTED MURDER IN THE FIRST DEGREE__
                    (THE COURT OR JURY)    (DESIGNATION OF CRIME AND DEGREE IF ANY, INCLUDING FACT THAT IT CONSTITUTES A SECOND OR SUBSEQUENT, IF THAT AFFECTS THE SENTENCE)

IN VIOLATION OF__ PENAL CODE SECTIONS 187(a) AND 664 _____
                    (REFERENCE TO CODE OR STATUTE, INCLUDING SECTION AND SUBSECTION THEREOF, IF ANY VIOLATED.)

EAR CRIME COMMITTED IS__ 1991 _____

E DEFENDANT IS CREDITED FOR TIME SPENT IN CUSTODY, __273__ TOTAL DAYS, INCLUDING:

CTUAL LOCAL TIME __182__ PC 4019 CREDIT __91__ STATE INSTITUTIONS TIME_____

COURT FINDS:    (*IF NO FINDING MADE, ENTER "NO FINDING MADE")

__NO FINDING MADE__ THE DEFENDANT _____ ARMED WITH A DEADLY WEAPON AT THE TIME OF HIS COMMISSION
                                        (WAS OR WAS NOT)

E OFFENSE WITHIN THE MEANING OF SECTIONS 969c and 12022 OF THE PENAL CODE.

. THE DEFENDANT__ USED __ A FIREARM IN HIS COMMISSION OF THE OFFENSE WITHIN THE
                    (USED OR DID NOT USE)

G OF SECTIONS 969d and 12022.5 OF THE PENAL CODE.

NO FINDING MADE . THE DEFENDANT _____ ARMED AT THE TIME OF HIS COMMISSION OF THE OFFENSE WITHIN
                                    (WAS OR WAS NOT)

NING OF SECTION 1203 OF THE PENAL CODE AND THAT WEAPON WAS

THE DEFE\_\_\_IT HAS HAD PRIOR FELONY CONVICTIONS A\_ \_LOWS:

| TE | COUNTY AND STATE | CRIME | DISPOSITION |
|---|---|---|---|
| 19-88 | SAN DIEGO CO., CA | VC 10851(a)<br>CASE #CR101305 | 3 YRS FORMAL PROBATION GRANTED ON 2-21-89. REV/REINSTATED 11-28-91. REV/2 YRS STATE PRISON 12-26-91, CONCURRENT WITH THIS CASE. |
| -19-89 | SAN DIEGO CO., CA | PC 459 1ST DEGREE<br>CASE #CRN15678 | 5 YRS FORMAL PROBATION GRANTED ON 11-28-89. REV/4YRS STATE PRISON 12-26-91, CONCURRENT WITH THIS CASE. |

It is therefore ordered, adjudged and decreed that the defendant be punished by imprisonment in the State Prison of the State of California for the term prescribed by law. It is ordered that the sentences shall be served in respect to one another as follows (CC or CS):

THE DEFENDANT IS TO SERVE THE MID TERM OF FOUR (4) YEARS CONSECUTIVE AS TO THE ALLEGATION OF PC12022.5(a). THE DEFENDANT IS TO SERVE THREE (3) YEARS CONSECUTIVE AS TO THE ALLEGATION OF PC12022.7. THE DEFENDANT IS TO SERVE FIVE (5) YEARS CONSECUTIVE AS TO THE PRIOR ALLEGED PURSUANT TO PC667(a). **TOTAL TERM IS 12 YEARS PLUS LIFE WITH THE POSSIBILITY OF PAROLE.**

and in respect to any prior incomplete sentence(s) as follows (CC or CS):

NOT APPLICABLE

It is further ordered that the defendant be remanded to the Sheriff of the County of San Diego; and pursuant to the aforesaid judgment, this is to command you, the Sheriff, to deliver the defendant into the custody of the Director of Corrections of the State of California at the California Institution for Women at Frontera, California at your earliest convenience.

R.J.DONOVAN CORRECTIONAL FACILITY, SAN DIEGO,

The Court ( DID ) instruct the defendant of his right to appeal in accordance with Rule 250, California Rules of Court.
did / did not

MICHAEL D. WELLINGTON
JUDGE OF THE SUPERIOR COURT

I certify the foregoing to be a true and correct abstract of the Judgment made and entered on the Minutes of the Superior Court herein.

Dated: 12-26-91

KENNETH E. MARTONE
CLERK OF THE SUPERIOR COURT

By ___Doug Peck___ DOUG PECK, ___Deputy

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

Troy A. Bartholomew

DEFENDANTS

Mendoza-Powers

**FILING FEE PAID**
Yes     No

**IFP MOTION FILED**
Yes     No

**COPIES SENT TO**
Court     Pro Se

**FILED**
JUL 14 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                    DEPUTY

**(b) COUNTY OF RESIDENCE OF FIRST LISTED** Kings
**PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Troy A. Bartholomew
PO Box 9
Avenal, CA 93204
H-18717

ATTORNEYS (IF KNOWN)

'08 CV 1270 IEG NLS

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
(For Diversity Cases Only)     FOR PLAINTIFF AND ONE BOX FOR DEFENDANT

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

**28 U.S.C. 2254**

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☒ 530 General | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ Security Act | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

DEMAND $

Check YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):** JUDGE                Docket Number

DATE   7/14/2008

SIGNATURE OF ATTORNEY OF RECORD

R Miller